**HALLIBURTON COMPANY and Continental Casualty Company, Appellants,**

v.

**NORTON DRILLING COMPANY and Liberty Mutual Insurance Company, Appellees.**

No. 19043.

United States Court of Appeals Fifth Circuit.

April 25, 1962.

432

Paul A. Gaudet, New Orleans, La., for
appellants, Deutsch, Kerrigan & Stiles,
William S. Stone, New Orleans, La., of
counsel.

John V. Baus, New Orleans, La., John
J. Weigel, New Orleans, La., for appel-
lees, Jones, Walker, Waechter, Poitevent,
Carrere & Denegre, New Orleans, La.,
of counsel.

Before TUTTLE, Chief Judge, and RIVES and WISDOM, Circuit Judges.

TUTTLE, Chief Judge.

This is an appeal from the dismissal of the appellants' third-party complaint wherein the appellants asserted a right to be indemnified by the appellee, the employer of the injured plaintiff, for any damages which might be recovered by by the plaintiff from the appellants. We affirm the judgment below.

In February, 1960, the appellee Norton, a drilling contractor, was engaged in drilling for oil in Lake Barre, in Terrebonne Parish, Louisiana. It was conducting the drilling operations from its submersible drilling barge. The plaintiff, Adam J. Sims, was employed by Norton as a member of the drilling crew of the barge.

On the morning of February 14, 1960, the appellant Halliburton, an oil well servicing concern, ran cemented casing into the well being drilled by Norton and furnished and installed what is referred to as a "cementing head" on top of the casing. This cementing head was a round, dome-shaped metallic object, weighing from 500 to 750 pounds. To facilitate the lifting of the cementing head off the casing when the casing was sufficiently hardened, there was attached to the top of the cementing head a metal, link-type chain.

On the afternoon of February 14, 1960, Sims and others in Norton's crew were directed to remove the cementing head from the casing. They apparently followed customary procedure by attaching a "catline" running from the barge's hoisting device to the chain on the cementing head. As the hoist started to lift the cementing head off the casing, the metal chain on the cementing head parted, causing Sims to become entangled in the catline and to fall from the place where he had been working to the drilling floor deck of the barge some 35 feet below. As a result, Sims sustained severe injuries.

Sims brought suit for damages against Halliburton and its liability insurance carrier, the appellant Continental Casualty Company, alleging that his injuries were caused by:

"* * * the negligence, carelessness and inattention of the defendant, Halliburton Co., its agents, servants and employees, and each of them, with respect to the manufacture, maintenance, upkeep and repair of the said cementing head and its appurtenances, particularly, but not exclusively the said handling chain of the said cementing head, as well as the negligent failure of the said defendant to furnish reasonably proper tools and appliances and to warn the plaintiff and others in his position of the dangers inherent therein."

The action was brought under the general maritime law, Lake Barre being a navigable waterway of the United States, and under the Louisiana Direct Action Statute, LSA–R.S. 22:655. The appellee Liberty Mutual Insurance Company, Norton's workmen's compensation carrier, intervened on the ground that it was subrogated to the rights of Sims for payments made under the applicable workmen's compensation statute.

Halliburton and Continental then filed a third party complaint against Norton. This complaint contained the following pertinent allegations:

"The cementing head, which had been screwed into the collar at the top of the casing, was equipped with a chain bridle, of adequate strength and in good condition, to facilitate lifting it off and lowering it to the drilling floor.

"If the chain bridle parted as alleged in plaintiff's complaint, it was solely and proximately caused to do so by the negligence and improper handling of the cementing head by plaintiff and/or other employees of Norton Drilling Company and/or other persons for whose acts Norton

**434**

Drilling Company is responsible and answerable.

"In the event that third-party complainants are held to have incurred any liability to plaintiff, Adam J. Sims, by reason of the facts and matters alleged in his complaint, which is expressly denied, third-party complainants are entitled to indemnity from Norton Drilling Company by virtue of its implied contractual warranty to remove the cementing head in a careful and workmanlike manner, and/or because Norton Drilling Company's primary, active and moving negligence proximately caused plaintiff's alleged injuries."

Norton moved to dismiss or for summary judgment on the ground that the third-party complaint failed to state a claim upon which relief could be granted in that it was merely an attempt to enforce contribution between joint tortfeasors, and action not recognized under maritime law in personal injury cases. None of the parties having offered supporting affidavits, the motion to dismiss was granted on the pleadings alone.

The appellants pitch their case on two alternative theories. First, they claim that Norton is obliged to indemnify because Norton was "actively" or "primarily" negligent, whereas Halliburton was merely guilty of "passive" or "secondary" negligence. Second, they assert that the obligation to indemnify arose from Norton's breach of a contractual warranty to perform its services in a careful and workmanlike manner.

■■ Appellant's claim based on the active-passive negligence dichotomy is clearly without merit. For one thing, the pleadings manifest no distinction in the kind or degree of negligence asserted against Halliburton and Norton. Sims, the plaintiff, seeks to hold Halliburton for furnishing defective equipment. Halliburton charges that Norton was negligent in handling this equipment. Both parties, therefore, are charged with active and affirmative negligence. See

Peak Drilling Company v. Halliburton Oil Well Cementing Company, 10 Cir., 215 F.2d 368. Furthermore, even if we were to agree with Halliburton that its fault was only passive or secondary, there is a serious doubt that this alone would be a sufficient ground for imposing an obligation to indemnify upon Norton, in view of the fact that the applicable workmen's compensation statutes have completely abolished an employer's *tort* liability for injuries to his employees. See Brown v. American-Hawaiian S. S. Company, 3 Cir., 211 F.2d 16 (Longshoremans Act); Mickle v. The Henriette Wilhelmine Schulte, N.D.Cal., 188 F.Supp. 77 (Longshoremans Act); McClintic-Marshall Co. v. O'Leary, 147 La. 85, 84 So. 503 (Louisiana Workmen's Compensation Law, LSA–R.S. 23:1021 et seq.).

The implied warranty claim is equally unavailing. In this regard, the appellants rest their hopes on Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, and the cases following in its wake. Ryan involved a claim for indemnity by a shipowner against a stevedoring company. An employee of the stevedoring company had been injured due to the improper stowage of cargo by the company. The employee brought suit against the shipowner based on the latter's absolute liability for injuries caused by the vessel's unseaworthy condition. The shipowner thereupon sought to hold the stevedoring company for any damages which the plaintiff-employee might recover. The Supreme Court allowed the claim for indemnity on the theory that the stevedoring company had contracted with the shipowner to perform its services in a careful and workmanlike manner, and that this constituted an agreement to indemnify the shipowner for any losses attributable to the company's failure to so perform. In a later case, Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413, the Supreme Court extended the holding of Ryan to a situation where the unseaworthy condition had been created by the shipowner

rather than the stevedoring company, but where the latter's negligence "brought the unseaworthiness of the vessel into play," thereby causing injury to the plaintiff-employee and exposing the shipowner to liability.

■ The initial defect in the appellants' claim based on the theory of implied warranty is that the pleadings are completely devoid of any indication that Norton promised Halliburton that it would remove the cementing head in a careful and workmanlike manner. In other words, the pleadings do not show that there was a contract between Norton and Halliburton, and, in the absence of a contractual relationship, there is no basis for a claim of contract indemnity. The third-party complaint states simply that Norton breached an implied contractual warranty to remove the cementing head in a careful and workmanlike manner. This is a naked conclusion of law, unsupported by the factual allegations of the complaint, and which need be given no weight in determining the sufficiency of the complaint. Mickle v. The Henriette Wilhelmine Schulte, supra, 188 F.Supp. at page 80.

■ Indeed, that there was no contract between Norton and Halliburton is demonstrated by the assertion in Halliburton's own brief that Norton's obligation to indemnify arose under "*its* [i. e. Norton's] drilling contract" with the owner of the well. It seems clear, therefore, that Halliburton and Norton were both merely independent contractors of the owner of the well and that there was no contract between them which would obligate Norton to make indemnity in the instant case. See Peak Drilling Company v. Halliburton Oil Well Cementing Company, supra.

■ But Halliburton then says that it is entitled to indemnity as a third party beneficiary of Norton's promise to the owner of the well that it would perform its drilling services in a careful and workmanlike manner. In support of this proposition, Halliburton points to Crumady v. The Joachim Hendrik Fisser, su-

pra, where the shipowner was allowed to recover from the stevedoring company even though the company had contracted with a charterer of the vessel rather than with the shipowner itself. That decision was based on the theory that:

"The warranty [of workmanlike service] which a stevedore owes when he goes aboard a vessel to perform services is plainly for the benefit of the vessel whether the vessel's owners are parties to the contract or not. That is enough to bring the vessel into the zone of modern law that recognizes the rights in third-party beneficiaries." Crumady v. The Joachim Hendrik Fisser Co., supra, 358 U.S. at 428, 79 S.Ct. at 448.

Unless we are to say that a drilling contractor's promise to perform in a careful and workmanlike manner inures to the benefit of the "well" itself and thence to all suppliers of equipment to the well, it is apparent that appellants' third-party beneficiary claim must fail. We are not inclined to expand the third-party beneficiary concept to the limits suggested by the appellants. It stretches credulity to imagine that Norton's promise to the owner of the well was intended to benefit each and every supplier of equipment to the well. While there is some logic in holding that a stevedore's warranty is meant to benefit the owner of the vessel, it would take the most artificial and tortuous reasoning to permit application of the third-party beneficiary theory to the facts of the instant case. We, therefore, reject the appellants' contention on this point.

Although we need not go so far in affirming the judgment below, it would not be inappropriate to discuss briefly a perhaps more fundamental reason supporting dismissal of the third-party complaint. We have assumed up to here that the third-party complaint could have withstood an attack on its sufficiency if the pleadings had manifested the existence of a warranty of workmanlike service running from Norton to Halliburton.

We might note at this point, however, that the validity of this proposition is open to serious question. As indicated previously, the appellants' claim in this regard is bottomed on the stevedore-shipowner cases wherein it has been held that a shipowner is entitled to indemnity from a stevedoring company if the negligence of the stevedoring company "brings into play" an unseaworthy condition which has its origin in some act or omission on the part of the shipowner. These decisions represent somewhat of a departure from the general rule that a contract will not be construed to provide for indemnification of the indemnitee for losses due to his own neglect, unless the intention to do so is expressed in unequivocal terms. 27 Am.Jur. Indemnity, Section 15. Cf. Jacksonville Terminal Co. v. Railway Express Agency, 5 Cir., 296 F. 2d 256. The reason for this exception to the general rule is explained in a recent opinion by Judge Mathes in Hugev v. Dampskisaktieselskabet International, S. D.Cal., 170 F.Supp. 601 at 609–610:

> "The stevedoring agreement is a maritime contract * * *, so any obligations to be implied as in fact arising from the contract should take cognizance of the maritime considerations involved. Ships, as well as seamen and longshoremen, are subject to the 'hazards of maritime service.' Ships still break up at sea. Even though the ships of today may not be as vulnerable, the typhoons of our day are as 'formidable and swift' as when Conrad wrote. The Pacific Coast is as treacherous now as it was some two generations ago when the Nottingham was battered into a hulk off the Oregon coast. The Nottingham, 9 Cir., 1916, 236 F. 618.

> "In almost every instance, when a stevedoring contractor commences the work of loading or unloading a seagoing vessel, the ship has arrived in port only a few hours before. She may have been at sea for weeks or months. Almost always, she has ridden some heavy seas. Often she may have rolled and pitched through mountainous seas for days, taking thousands of tons of water over her decks, sailed through freezing and tropical weather, and been beaten by 100 mile an hour gales. Almost surely she will have been serviced by stevedores of varying degrees of competency in other parts throughout the world.

> "Being a mass of plates, pipes, wires, beams and various mechanisms, each to some degree vulnerable to the elements, it would be too much to expect a cargo vessel to arrive in port with all equipment, appliances and facilities in a fully seaworthy condition. Especially is this true with respect to the hatches, booms and winches, which are relatively more likely to be in disorder because of the elements, and the abuse and misuse of men as well. It is reasonable to expect, then, that many things may be wrong with a freighter and her equipment and appliances when she arrives in port; that she may well be a place of danger even as she docks. And all of these lurking dangers may be due entirely to the hazards of the ship's service.

> "The stevedoring contractor knows that the ship has been at sea; that she may be in many respects dangerous to the life and limb of an unskilled person; that if a condition is found which is unsafe for the professional longshoreman, as a rule the contractor can remedy it at the expense of the shipowner; that if the stevedoring operations are thereby delayed, the shipowner normally must pay for standby time.

> "Stevedoring contractors hold themselves out as being trained and equipped to cope with these conditions and these dangers. To this end, the stevedoring contractor is usually given full use and charge of the ship's loading and unloading equipment and appliances and the cargo hatches and holds. So it is

that the stevedoring contractor cannot reasonably expect, and does not expect, to board a vessel which in all respects, as to equipment and appliances as well as hull, is in a seaworthy condition, or even in a reasonably safe condition. Hence it is not reasonable to infer that the shipowner, in executing the stevedoring contract, impliedly covenants that the condition of the ship or of her equipment or appliances will exceed the stevedoring contractor's reasonable expectations."

■ It is apparent that none of the considerations discussed by Judge Mathes are present in the instant case. Certainly, a drilling contractor has no reason to expect that equipment furnished by a supplier to the well may be so defective as to be dangerous to life and limb. Consequently, it is highly unreasonable to assume that a drilling contractor, merely by agreeing to perform its services in a careful and workmanlike manner, intends to immunize the supplier of defective equipment from liability for any losses attributable in whole or in part to such defect. Thus, even if Norton did promise Halliburton, either directly or indirectly, that it would remove the cementing head with reasonable care, we would have difficulty construing this as a promise to indemnify Halliburton for losses traceable directly to a defect in the cementing head, for which defect Halliburton alone would be responsible.

■ One final point. Halliburton also contends that it is entitled to indemnity under the law of Louisiana. Apart from the fact that federal maritime law is controlling here, see Koninklyke Nederlandsche Stoomboot Maalschappy, N. V., Royal Netherlands Steamship Company v. Strachan Shipping Co., 5 Cir., March 30, 1962, 301 F.2d 741, and Offshore Co. v. Robison, 5 Cir., 1959, 266 F.2d 769, 75 A.L.R.2d 1296, we might also state that the same result we have reached would follow if the law of Louisiana were applied. See United Gas

Corporation v. Guillory, 5 Cir., 1953, 206 F.2d 49.

■ Of course, we recognize that a complaint cannot ordinarily be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80. We think this rule was satisfied in the instant case, and that the District Court was, therefore, correct in dismissing the third-party complaint.

The judgment is

Affirmed.

RIVES, Circuit Judge (dissenting).

This appeal is from the dismissal of a third-party complaint on the basis of the pleadings alone. The third-party complaint was filed in accordance with Rule 14(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., which allows the defendant in an action to file such a complaint "upon a person not a party to the action who is or may be liable to him for all or part of the plaintiff's claim against him." Under the Rule, the court has discretion to determine whether it will allow the third-party complaint to be filed, but having been allowed, the complaint becomes subject to the general rules of pleading. By its own terms, Rule 14 provides that defenses, cross-claims, and counterclaims must be filed in accordance with Rules 12 and 13. Under the definition of Rule 7, a third-party complaint, like an original complaint, is a pleading whose form is prescribed by Rule 8. It would therefore appear that a third-party complaint is subject to the same liberal rules of construction as an original complaint. A liberal construction is also dictated by the purpose of Rule 14 itself —to do away with circuity of action. 3 Moore, Federal Practice, p. 412, § 14.04, p. 417, § 14.07. See also Jones v. Waterman S. S. Co., 3 Cir., 1946, 155 F.2d 992, 997; Nora v. Pittston Stevedoring Co., E.D.N.Y., 1950, 90 F.Supp. 35, 36. In Travelers Ins. Co. v. Busy Electric Co.,

5 Cir., 1961, 294 F.2d 139, 143, this Court applied to a third party complaint the test stated in Conley v. Gibson, 1957, 355 U.S. 41, 45–46, 78 S.Ct. 99:

> "In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

We have often approved the wise statement of Judge Sibley for this Court in De Loach v. Crowley's, Inc., 5 Cir., 1942, 128 F.2d 378, 380:

> "Under the Rules of Civil Procedure a case consists not in the pleadings, but the evidence, for which the pleadings furnish the basis. Cases are generally to be tried on the proofs rather than the pleadings."

See also Des Isles v. Evans, 5 Cir., 1952, 200 F.2d 614, 616.

It is especially important in this case that the issues be decided upon the proofs and not the pleadings because of the difficult nature of the legal issues involved. Otherwise, we may find ourselves exploring theories of liability and deciding legal questions which would prove to be abstract and nonexistent under the facts of the case as revealed by the evidence.

Halliburton has alleged that Norton breached its contractual warranty of workmanlike services by the manner in which it removed the cementing head. In a somewhat similar situation where a shipowner has been subject to a personal injury suit due to the failure of a stevedoring company to perform its duties in a workmanlike fashion, the Supreme Court has implied such a warranty in the stevedoring contract and allowed recovery against the stevedore. See Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L. Ed. 133; Weyerhaeuser S. S. Co. v. Nacirema Co., 1958, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491; Crumady v. The Joachim Hendrik Fisser, 1959, 358 U.S. 423, 432, 79 S.Ct. 445, 3 L.Ed.2d 413. To date, this rule has not been widely extended beyond the stevedore-shipowner relationship. It is, however, open to the third-party plaintiff to show, if he can, that there is a similar need for a federal maritime rule to govern the offshore gas and oil contracts here in question. Cf. Wilburn Boat Co. v. Fireman's Fund Ins. Co., 1955, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337. Also in issue is the nature of the contracts involved. It does not appear from the pleadings whether there is a direct contractual relationship between Halliburton and Norton, or whether they have each contracted through a third party, the well owner. Looking to the pleadings as a whole, the original complaint of the injured workman alleges. that "Halliburton Company had furnished certain equipment to the Plaintiff's said employer," Norton. The third-party complaint then alleges. breach of an implied contractual warranty. Under these allegations, I think it is open to Halliburton to show a direct contract with Norton. Or, in the alternative, it may be able to show that it is a third-party beneficiary on Norton's contract with the well owner. See Waterman Steamship Corp. v. Dugan & McNamara, Inc., 1960, 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169.

Perhaps the leading case allowing indemnity against an employer who had protected himself with workmen's compensation is Westchester Lighting Co. v. Westchester County Small Estates Corp., 1938, 278 N.Y. 175, 15 N.E.2d 567. In that case an independent contractor had been hired to make certain repairs and in the process of performing his services ruptured a gas line. Before the escaping gas was discovered, an employee of the contractor was overcome. His widow recovered from the landowner, who then sued for indemnity from the contractor on the ground that he had breached an independent duty or obligation in the performance of his services; the contractor pleaded the exclusive remedy clause of the New York Workmen's.

Compensation law, McKinney's Consol. Laws, c. 67, § 1 et seq., from which the Longshoremen's Act and many other state compensation acts were derived. The court reversed the lower court's denial of the indemnity, holding that "an independent duty or obligation owed by the employer to the third party is a sufficient basis for the action." 15 N.E.2d at 569. This doctrine, however, got little real support until the Supreme Court's decision in Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., supra, where the Court found that a similar independent obligation to perform services in a workmanlike fashion was "the essence of petitioner's stevedoring contract" and found an implied contractual warranty. When the situation arose where the shipowner and stevedore were not tied directly by contractual relations, the Court had no trouble in allowing the shipowner to recover as a third-party beneficiary on the stevedore's contract with the shipping agent. Crumady v. The Joachim Hendrik Fisser, supra.

The Ryan doctrine did not come limited to the stevedoring situation, however. As already pointed out, it had been the law of New York for some time in the service contract area. After Ryan, a number of other state and federal courts have extended the theory of the doctrine, and the rationale of recovery. In the recent case of McDonnell Aircraft Corp. v. Hartman-Hanks-Walsh Painting Co., Mo.1959, 323 S.W.2d 788, the employee of a contractor hired to paint the third party's plant was injured by high tension wires and sued to recover from the third party. The third party brought in the contractor on the ground that the contractor had breached its duty of performance since it had been warned of the open wires. The court found that the facts alleged in the pleadings established a common-law right of indemnity on the basis of active/passive negligence. It then turned to the typical exclusive remedy clause of the Missouri compensation act and, citing Ryan, concluded that facts which support a common-law indemnity would also support an implied contrac-

tual warranty not barred by the act. In a similar fashion in American President Lines, Limited v. Marine Terminals Corp., 234 F.2d 753 (9th Cir., 1956), cited with approval in Weyerhaeuser S. S. Co. v. Nacirema Co., supra, the court determined that the facts supported a common-law indemnity for active/passive negligence and then shifted to Ryan and the implied contractual warranty to avoid the exclusive remedy clause of the Longshoremen's Act. Other courts, while not using the contractual warranty language, have come to the same result. In American District Tel. Co. v. Kittleson, 8 Cir., 1950, 179 F.2d 946, the court held that proof of a common-law indemnity on the basis of active/passive negligence was not barred by the exclusive remedy clause of the Iowa compensation act on the ground that, as in Westchester, supra, the facts indicated breach of "an independent duty owed by the employer to the third party." If this were a post-1956 decision, the court could as easily have called it a breach of an implied contractual warranty. In General Electric Co. v. Moretz, 4 Cir., 1959, 270 F.2d 780, the shipper, in spite of the Tennessee compensation act, was allowed an indemnity over against the carrier for a personal-injury recovery by the carrier's truck driver, because ICC regulations made the carrier responsible for the proper loading of the truck and the bills of lading agreed to hold the shipper harmless for damage inflicted on the cargo. In that case, the "independent duty" was based on these promises and regulations and an indemnity was allowed even though the shipper had himself loaded the truck and breached his duty under other ICC regulations to load it properly. In Burris v. American Chicle Co., 2 Cir., 1941, 120 F.2d 218, the independent duty was based on state law.

Turning to the present case, the majority has held on the pleadings that the appellants could prove no "independent duty" owed by Norton to Halliburton either directly or as third-party beneficiary. The majority is of the opinion that "it would take the most artificial and tor-

tuous reasoning" to conclude that under any set of facts the driller might have obligated himself for the benefit of third-party suppliers to handle their equipment in a proper workmanlike fashion. It is at this point that we disagree.

To distinguish the stevedore case, the majority stresses the unique circumstances of his relation to the shipowner, such as his expertise, his special competence to handle equipment which has undergone the rigors of the sea, and his warranty to guard against the unforeseen. Upon reflection, however, the driller on an oil barge is not in a far different situation. A driller is in a hazardous business under any circumstances; since he handles unusually complex equipment and a highly volatile material, the likelihood of accidents and extraordinary damage is great. Upon a drilling barge, the small working space accentuates these factors, and added to them are the corrosive maritime factors of the sea and open weather. The driller's special situation is further emphasized by the fact that he is in control of the drilling barge, drilling equipment, and all the operations connected with the creation of a producing well. Under his general control a whole stream of independent contractors bring on special equipment and carry out specialized operations, such as the cementing of the well. Many of these operations, as in this case, are then turned over to the driller for completion and the equipment put in his control. While in his control it is subject to all the normal drilling hazards plus the added maritime factors mentioned above, factors which are part of the driller's specialized knowledge. Under such circumstances, sloppy performance, insufficient precautions, failure to guard against the effect of maritime factors on equipment most probably designed for shore use, can not only enhance the possibility of serious injury, but open the supplier of special equipment to liability he may not have been able to foresee. Equipment, which was otherwise of sound construction, may prove "defective" under the unusual stresses present on a drilling barge; it may prove "defective" if negligently handled; it may actually be defective under any circumstances, but so obviously so that the most amateur driller should have noticed. Added to this is the fact that the supplier is no longer present and able to control the further handling of the equipment or even observe how it is handled—he has entrusted it to the care and expertise of the driller. Under such circumstances would it be "most artificial and tortuous" to reason that the driller warrants to the independent contractors that he will exercise the care that is to be expected of an expert who offers specialized services under very hazardous circumstances. I am unable to say that there might not arise under such circumstances an independent duty between the driller and the supplier either directly or as third-party beneficiary that the driller will carry out his services in a workmanlike manner.

The majority stresses that to supply defective equipment under any circumstances is such an act of affirmative negligence that it could never be the "passive, technical, or constructive" negligence which would justify the shifting of liability. I would only point out that such affirmative acts are present in many cases, and the courts have decided that the balancing of such factors is for the jury. In Weyerhaeuser, supra, the shipowner, against all customary practice and good judgment, had allowed temporary winch shelters to go to sea and then turned them over to the stevedore. In Crumady, supra, the shipowner had set the governor on the loading boom at twice the recommended safe load. In Moretz, supra, the shipper himself had negligently loaded the truck. But in each case the Court ruled that it was for the jury to weigh this failure against the primary warranty of the injured party's employer. Or, as suggested above, the defect may only appear because of unusual hazards which are primarily in the specialized sphere of the warrantor.

The foregoing long and discursive statement of possible situations which would entitle the third-party plaintiffs to relief is justified only because the majority declines to follow the rule generally applicable to the effect that the case should be tried on the proofs rather than the pleadings.

I respectfully dissent.