**CENTRAAL STIKSTOF VERKOOP-KANTER, N. V., Appellant,**

v.

**WALSH STEVEDORING COMPANY, Inc., et al., Appellees.**

No. 22275.

United States Court of Appeals
Fifth Circuit.

June 28, 1967.

Rehearing Denied Aug. 15, 1967.

---

Rae M. Crowe, Mobile, Ala., John W. McConnell, Jr., Armbrecht, Jackson & DeMouy, John Grow, Mobile, Ala., for appellant.

Alex F. Lankford, III, Mobile, Ala., Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, Ala., of counsel, for Walsh Stevedoring.

Irwin W. Coleman, Jr., Mobile, Ala., Sam W. Pipes, III, Mobile Ala., for appellee United States Fidelity and Guaranty Co., Lyons, Pipes & Cook, Mobile, Ala., of counsel.

Before RIVES, GEWIN and GOD-BOLD, Circuit Judges.

GEWIN, Circuit Judge:

Centraal Stikstof Verkoopkanter, N. V. (CSV) brought this suit in the United States District Court for the Southern District of Alabama against Walsh Stevedoring Co., Inc. (Walsh) and United States Fidelity & Guaranty Co. (USF& G), as insurer of the Alabama State Docks at Mobile, for damage to approximately 950 tons of nitrolime, a commercial fertilizer, stored at the State Docks. The district court granted a summary judgment for USF&G and a trial by jury resulted in a verdict for Walsh. The district court entered a judgment in accordance with the verdict and CSV appeals. We affirm.

CSV is a Dutch exporter of nitrolime, a highly corrosive chemical fertilizer composed of ammonium nitrates and calcium carbonate. Nitrolime consists of small particles or "pellets", approximately $\frac{1}{8}$th to $\frac{1}{16}$th of an inch in diameter. In order for it to be marketable as commercial fertilizer, it is essential that the pellets be free flowing or the nitrolime will clog up the fertilizer drills. When wetted the nitrolime will lump, harden and set up like concrete. In addition, water has a tendency to seep through the fertilizer and if wet nitrolime is not separated from the dry material, the water will contaminate the dry fertilizer and increase the damage.

In the summer of 1959, CSV shipped approximately 10,300 tons of nitrolime from Rotterdam, The Netherlands to Mobile, Alabama, aboard the S. S. Propontis. Walsh, pursuant to a contract entered into with CSV's representative in the United States, Bradley & Baker, unloaded the nitrolime in September 1959, and stored it in bulk in warehouse Center C, Room 9 of the Alabama State Docks at Mobile. A warehouse receipt was issued by the State Docks to Bradley & Baker. On January 16, 1960, the sprinkler system in the warehouse discharged and seriously damaged the 950 tons of fertilizer.

The contract between Walsh and Bradley & Baker was originally entered into in 1956 and was renewed every year until the time the damage here in issue occurred. Under the contract Walsh was to stevedore vessels in Mobile, Alabama, and Gulfport, Mississippi, for Bradley & Baker as owner, agent, or charterer. The contract required Walsh to unload the nitrolime, store it, weigh it if necessary, package it if required, and deliver it to a carrier when needed to meet sales. Specific rates were provided by the contract for each operation. The contract also provided that Walsh's liability for damage to cargo would be limited to physical damage caused by its negligence.[1]

Prior to the arrival of the S. S. Propontis in Mobile, the State Docks announced an increase in the storage rates for nitrolime. Bradley & Baker requested Walsh to obtain storage facilities at the former lower rate and Walsh arranged to use the Center C, Room 9 warehouse. Center C, Room 9 is a metal clad frame building equipped with a sprinkler system. The pipes hung approximately 18 inches below the ceiling, and the heads were placed approximately 9 to 10 feet apart. The sprinklers were installed in 1931 and 1932, and, though at the time the nitrolime was

---

1. The applicable section of the contract provided that:

"8. Responsibility for Damage or Loss. The Contractor will be legally liable for damage to the ship and its equipment, and for damage to cargo, or loss of cargo overside through its negligence. When such damage occurs to ship or its equipment, or where loss or damage occurs to cargo by reason of such negligence, the Ship's Officers or other authorized representatives will call this to the attention of the Contractor at the time of accident. With respect to claims for loss or damage to cargo and/or baggage, the liability of the Contractor shall be limited to physical damage caused by the negligence of the Contractor and to such claims that result from fraud on the part of employees of the Contractor engaged in the delivery, receiving and watching of cargo."

stored in the warehouse, the system showed signs of age, neither the pipes nor the sprinkler heads had been replaced since they were installed. In December 1959, one of the sprinkler heads discharged and was replaced. The condition of the sprinkler system and the fact that one head had discharged was, at that time, brought to the attention of the manager of the State Docks. It was known and recognized that repairs were necessary at that time.

Upon the arrival of the S. S. Propontis, Walsh unloaded the nitrolime by means of clamshell buckets. The nitrolime was deposited into hoppers on the pier and from there loaded into trucks for the short haul to the warehouse. At the warehouse the nitrolime was dumped into a hopper and carried by means of conveyor belts to a carloader which was used to pile the fertilizer in the warehouse. The carloader propelled the nitrolime some ten or fifteen feet and could be turned in any direction so as to place the material in the desired location. It was admitted that the carloader was capable of piling the nitrolime to the height of, or above the sprinkler pipes.

CSV contended at trial that Walsh negligently loaded the warehouse in that it permitted the nitrolime to come in contact with the sprinkler system, thereby causing the trigger mechanism in a sprinkler head to corrode and eventually discharge the water. It also contended that Walsh breached an implied warranty of workmanlike service in storing the fertilizer improperly. CSV further asserted that USF&G was liable under the policy it issued to the State Docks for the Dock's negligence in allowing the nitrolime to remain improperly stored.

On this appeal CSV argues that as to its claim against Walsh, the verdict is against the great weight of the evidence, and the district court erred in not submitting its implied warranty theory to the jury. It also contends that it is not required under Alabama law to prove its case by a preponderance of the evidence as charged by the district court, that the district court erred in not charging the jury with respect to the legal consequences of Walsh's failure to store the nitrolime as required by Coast Guard regulations, and that the district court's jury charge as to proximate cause was incorrect. With respect to USF&G, it asserts that in granting summary judgment the district court misconstrued the statute authorizing the State Docks to obtain insurance, and the insurance policy itself. In addition, it contends that the district court erred in granting summary judgment because a question of fact existed as to the applicability of the exclusions in the policy.

I

CSV's cause of action against Walsh went to the jury on two theories: one sounding in tort for negligence, and one sounding in contract for negligent breach of contract. CSV alleged that the discharge of the sprinkler system was the result of the corrosion of the trigger mechanism caused by, or accelerated by, the covering of the sprinkler heads by the nitrolime, or the close proximity of the nitrolime to the sprinkler heads. It contended that Walsh had handled nitrolime before and was aware, or should have been aware of its extremely corrosive nature. It argues that as a stevedore Walsh held itself out to be an expert in the handling of such cargoes and that under its contract Walsh was required to exercise an extremely high degree of care in storing the nitrolime. Thus, it concludes Walsh breached its obligation toward CSV when it permitted the fertilizer to be piled in the warehouse in such a manner as to come in contact with, or in close proximity to, the sprinkler heads, and is liable for the damage. Finally, CSV asserts that Walsh owed it a continuing duty to watch over the fertilizer and that Walsh was negligent in allowing the fertilizer to remain stored in an improper manner.

Walsh argues that the nitrolime was properly stored, that it did not come in contact with nor was it dangerously close to the sprinkler system, and that the discharge was the result of the age

528

and condition of the sprinkler system. It asserts that the pipes and the heads were corroded and in need of repair before the nitrolime was placed in the warehouse, and the deterioration of the system due to its age caused the trigger mechanisms to give way and discharge the water. It also contends that it owed CSV no obligation to watch over the cargo and that the nitrolime was in the care and custody of the State Docks at the time the damage occurred.

■ In support of its argument that Walsh owed it a continuing duty to watch over the nitrolime, CSV relies on the language of the contract which provides that Walsh shall be liable for claims resulting from the fraud of its employees engaged in delivering, receiving, and *watching* the cargo. CSV asserts that this language implies an obligation on the part of Walsh to watch over the cargo during its storage at the State Docks. We cannot agree. In context, this portion of the contract clearly refers to the actual unloading and storage operations, and does not create a continuing obligation on the part of Walsh to watch over the stored cargo.

■■ The evidence presented at the trial as to the manner in which the fertilizer was stored was conflicting. Not only were there conflicts in the evidence, this is a typical case in which the jury was authorized to make credibility choices with respect to the testimony of the witnesses. CSV permitted the case to go to the jury without moving for a directed verdict. See Rule 50 F.R.Civ.P. No motion was made for a judgment n. o. v., and CSV did not move for a new trial on the grounds that the verdict was against the great weight of the evidence. Absent a motion for a directed verdict this Court may review the sufficiency of the evidence only if it constitutes plain error which if not noticed would result in a miscarriage of justice. United States v. Harrell, 133 F.2d 504 (8 Cir. 1943). Since we are convinced from a study of the record that no such error exists in this case, we are foreclosed from a further examination of the record to determine whether the verdict is against the great weight of the evidence. Thomas v. Akin Equip. Co., 309 F.2d 331 (5 Cir. 1962); Pruett v. Marshall, 283 F.2d 436 (5 Cir. 1960); 2B Barron & Holtzoff, Federal Practice & Procedure; § 1081, pp. 424–25 (Wright Ed.1961). In any event, as a reviewing Court we feel that the jury verdict in this case should not be disturbed in view of the limitations on judicial review of findings by a jury. See United States v. U. S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746, 766 (1948). We are not convinced that there was plain error apparent on the face of the record which if not noticed would result in a manifest miscarriage of justice. We accordingly conclude that CSV's first point of error is without merit.

II

CSV next claims that in addition to any liability Walsh might have assumed for damage resulting from its negligence, Walsh is liable for damage under an implied warranty to perform in a competent and workmanlike manner which resulted from its failure to perform the stevedoring services required by the contract in such a manner. CSV argues that when Walsh held itself out as a stevedore, it represented that it was an expert in the handling of cargo, including nitrolime, and that by virtue of its representations and the contract between the parties it impliedly warranted that it would perform the stevedoring services in a competent, safe, and workmanlike manner. This argument is based largely on Ryan Stevedoring Co. v. Pan Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed.2d 133 (1956) where the Supreme Court held that when a stevedore contracted to perform stevedoring services for a shipowner, it impliedly warranted that the services would be performed in a competent and safe manner. The Court therefore concluded that a shipowner could recover against a stevedore in an action for indemnification based on a breach of the implied warranty of workmanlike performance when the stevedore's breach of the warranty resulted in the shipowner's liability to an employee

of the stevedore for the unseaworthiness of the vessel.

■ Although *Ryan* involved the negligence of the stevedore, subsequent decisions clearly established that negligence was not the basis of the shipowner's remedy against the erring stevedore, but that the remedy was based on contract. Weyerhauser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958). Thus, the shipowner may maintain the action against the stevedore even if the stevedore's breach of the implied warranty was a non-negligent breach, Italia Societa Per Azioni de Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964), and even if the shipowner was negligent itself. *Weyerhauser S.S. Co.*, supra.

> "Although in *Ryan* the stevedore was negligent, he was not found liable for negligence as such but because he failed to perform safely, a basis for liability including negligent and nonnegligent conduct alike. * * *
>
> "[T]he stevedore's obligation to perform with reasonable safety extends not only to stowage and handling of cargo but also to the use of equipment incidental thereto, Weyerhauser S.S. Co. v. Nacirema Operating Co. [supra], including defective equipment supplied by the shipowner, Crumady v. The J. H. Fisser, [358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959)] * * * and * * * the shipowner's negligence is is not fatal to recovery against the stevedore." Oregon Stevedoring Co., supra, 376 U.S. at 319–20, 84 S.Ct. at 751, 11 L.Ed.2d at 738.

See Pettus v. Grace Line, Inc., 305 F.2d 151 (2 Cir. 1962). Thus, under *Ryan* the shipowner may recover against the stevedore for indemnity if the shipowner's liability resulted from the stevedore's failure to perform its contract in a workmanlike fashion, irrespective of the nature of the breach of the warranty. Metropolitan Stevedoring Co. v. Dampskisaktieselskabet Int'l., 274 F.2d 875 (9 Cir. 1960).

■ The *Ryan* doctrine establishes a severe and harsh rule which imposes a substantial and heavy burden on the stevedore or one similarly situated. See Ryan Stevedoring Co. v. Pan Atlantic S.S. Corp., supra, 350 U.S. at 135, 76 S.Ct. 232, 100 L.Ed. at 142 (1956) (Black, J. dissenting). Because of the weight of this burden, and because of the far reaching implications of the doctrine if applied outside its original context, we have been slow to expand the scope of the doctrine beyond the original factual circumstances in which it arose. Accord, Ocean Drilling & Exploration Co. v. Berry Bros. Oilfield Service, Inc., 377 F.2d 511 (5 Cir. 1967—No. 23421). See, e.g., Delta Engineering Co. v. Scott, 322 F.2d 11 (5 Cir. 1963); Halliburton Co. v. Norton Drilling Co., 302 F.2d 431 (5 Cir. 1962). The implied warranty established in *Ryan* is a product of the admiralty courts and a creature of admiralty law. It is tied closely to the duties and obligations which the admiralty law imposes on shipowners with respect to those employed by and who work on a ship. Italia Societa Per Azioni De Navigazione v. Oregon Stevedoring Co., 376 U.S. at 324, 84 S.Ct. 748, 11 L.Ed.2d at 740–41. Those cases in which the doctrine has been applied have been admiralty cases which presented substantially similar circumstances to those existing in *Ryan*. DeGoia v. United States Lines, 304 F.2d 421 (2 Cir. 1962); United States v. Tug Manzanillo, 310 F.2d 220 (9 Cir. 1962); Smith v. Brown & Root Marine Operators, Inc., 243 F.Supp. 130 (W.D.La.1965), aff'd sub nom., Underwater Services, Inc. v. Brown & Root Marine Operators, Inc., 376 F.2d 852 (5 Cir. 1967—No. 23362); Dog River Boat Services, Inc. v. The Francis, 192 F.Supp. 759 (S.D.Ala.1961). We are accordingly hesitant to apply the doctrine to this, a non-maritime diversity case, which is controlled by Alabama and not federal maritime law. General Dynamics Corp. v. Adams, 340 F.2d 271 (5 Cir. 1965).

CSV asserts that a similar warranty exists under Alabama law and in support of its contention refers us to Broyles v. Brown Engineering Corp., 275 Ala. 35,

151 So.2d 767 (1963). In that case the Alabama Supreme Court held that a civil engineering firm employed to design a sewage system for a proposed development impliedly warranted that the plans and specifications would be adequate for the intended purposes. Walsh does not directly meet CSV's argument, but rests on its contract with Bradley & Baker which provided that in the case of damage to cargo, Walsh would be liable only for the physical damage caused by its negligence.[2] Thus, Walsh asserts, it was only required to exercise the care and diligence in handling the nitrolime that an ordinary prudent and skillful person would have used in the same circumstances. Since CSV failed to demonstrate that it breached that duty, Walsh concludes, it is not liable for damage to the fertilizer.

Broyles v. Brown Engineering Corp., supra, involved a suit by a builder against an incorporated group of civil engineers for failure to design a sewage system that was adequate for the needs of a projected development. The plaintiff alleged that the engineers had impliedly warranted that the plans and specifications for the system would be adequate for the purposes in view. After construction of the sewage system in accordance with the plans it was discovered that the storm drainage was inadequate and that as a result the development was subject to periodic flooding. The trial court dismissed the plaintiff's claims as to the implied warranty on demurrers, and the Supreme Court of Alabama reversed. The Court held that when the defendants had held themselves out to be civil engineers they represented that they were experts in that field. Since they were aware of the purpose for which their service was procured, it concluded that a reasonable and just inference was that they warranted that the plans would be adequate to meet those needs.

"The defendant professed to be an expert or held itself out to be, and certainly was charged with notice that correct and adequate plans were essential for adequate drainage of rain water from the area of land to be converted. Common understanding and the ordinary course of dealing would speak up and justify a reasonable conclusion, as we view all the circumstances and the nature of the contract, that the parties mutually intended an agreement of guaranty as to the sufficiency and adequacy of the plans and specifications to accomplish proper and adequate drainage." 151 So.2d at 771.

The Court also observed that restricting the plaintiff's remedy to negligence on the part of the defendant would place too great a burden upon the plaintiff in the circumstances of the case. 151 So.2d 772. The Court therefore concluded that a reasonable inference under the facts and in the circumstances of that case was that the parties mutually intended that the engineers would guarantee the adequacy of the plans and specifications. Regardless of the labels used to describe the reasons for the conclusion which the Court reached, the opinion held that Brown Engineering failed to do the very thing they were employed to do.[3] In

---

2. See footnote 1 supra.

3. The following is from the opinion:
"The contention of the plaintiffs in each count, briefly stated, is that the defendant, being informed of the nature of the project and the need of civil engineering services to define and draw plans and specifications for adequate drainage of a tract of land to be developed, accepted employment for the rendition of such engineering services. The complaint further charges that the drainage areas depicted on the plans submitted by the defendant were incorrect and did not show adequate storm drainage easements where necessary; that the drainage plans were inadequate for the purpose for which they were to be used; and that the drainage of the subdivision, due to the incorrectness of the plans and specifications submitted by defendant pursuant to its employment by plaintiffs, was (and is) subject to periodic floodings." (P. 769)
* * * * *
" * * * Common understanding and the ordinary course of dealing would speak up and justify a reasonable conclusion, as we view all the circumstances and the nature of the contract, that the parties mutually intended an agreement of guaranty as to the sufficiency and adequacy of the plans and specifications to accomplish proper and adequate drainage.

reaching its conclusion, the Court was careful to note, however, that an implied warranty can only be inferred if the existence of such a warranty is consistent with the provisions of the express contract. 151 So.2d 772. Thus, under the rationale of the *Broyles* opinion an implied warranty of workmanlike performance can only exist if it may be inferred from the conduct of the parties that they mutually intended to create such a warranty, and if the existence of such a warranty is not precluded by the express terms of the contract.[4]

■■ This limitation on the existence of an implied warranty brings the *Broyles* decision in line with the general Alabama rule that an implied warranty can not be inferred as to the same general subject matter covered by an express warranty in the contract. Louis Pizitz Dry Goods Co. v. House of Van Praag, 219 Ala. 183, 121 So. 701 (1929); Grassell Chem. Co. v. City Ice Co., 200 Ala. 172, 75 So. 920 (1919); Holt Lumber Co. v. Givens, 196 Ala. 640, 72 So. 257 (1915). Thus, for example, it is clearly established that no implied warranty of workmanlike construction exists in the case of the sale of a house, or in similar real estate transactions. Druid Homes, Inc. v. Cooper, 272 Ala. 415, 131 So.2d 884 (1961). Since Walsh's contract limited

its liability for damage to cargo to the physical damage resulting from its negligence, we believe that under applicable Alabama law it is not permissible to draw the inference that Walsh impliedly warranted to perform in a competent and workmanlike manner. This is not to say that Walsh failed to perform the contract in a competent and workmanlike manner. The provision of the contract which limits Walsh's liability constitutes an express warranty as to the quality of service which Walsh promised to perform, and precludes the existence of an implied warranty. Louis Pizitz Dry Goods Co. v. House of Van Praag, supra; American Mut. Liability Ins. Co. v. McDiarmid, 211 Ala. 127, 99 So. 849 (1924). We therefore conclude that the district court was correct when it refused to submit CSV's implied warranty theory to the jury.

■ We have carefully reviewed CSV's remaining contentions with respect to its claim against Walsh, and conclude that they are without merit. These contentions relate chiefly to claimed deficiencies in the jury instructions given by the Court with respect to the burden of proof, proximate cause, and the effect of certain Coast Guard regulations. It is sufficient to say that the court's charge was generally approved by counsel for the parties.[5] As to one of the alleged errors in

---

To hold otherwise would be to ignore practical and common sense implications that arise from contractual dealings and negotiations as here presented in the complaint." (P. 771)

4. It is arguable that the contract involved in *Broyles* was an oral contract in the first instance. Under that interpretation of the decision, the Court was presented with the problem of determining the terms of the contract from the surrounding circumstances which gave rise to the contract. Thus, the opinion may be interpreted as holding that the warranty was a part of the contract and not an appendage to an express contract as presented by the case before us. In light of resolution of the issue before us, however, we do not rely on that construction of *Broyles*.

5. The following is from the record:
"Gentlemen, this concludes the charge of the Court in chief. It is provided by the Federal Rules of Civil Procedure that if either party wishes to except or

object to the charge as given, or if either party wishes to request that additional charges be given, that any such exceptions, objections or requests may be made out of the presence and hearing of the jury.

I will now ask if there will be any such exceptions, objections or requests.
MR. McCONNELL:
On behalf of the plaintiff, Your Honor, I think the charge is very good. The things that we have to—
THE COURT:
If you are going to have any objections or exceptions, I am going to excuse the jury.
MR. McCONNELL:
We have only one, Your Honor. (The jury withdraws.)
MR. McCONNELL:
This is minor, Your Honor, it is right toward the end about the fourth or fifth from the last of your charges there relative to the fact that the defendant must be negligent and that that negligence

the charge relating to negligence and proximate cause, the record indicates that a typographical error was apparently made in preparing the transcript, but if not, the error was corrected by positive, clear, and unequivocal instructions on the subject in other portions of the charge. A careful reading of the entire charge convinces us that it was adequate, complete and fair. Accordingly, the judgment of the district court with respect to Walsh is affirmed.

## III

We turn now to CSV's claim against USF&G. On this appeal CSV asserts that the district court erred in granting summary judgment for USF&G because the statute enabling the State Docks to obtain liability insurance required that the coverage of any insurance policy obtained by the State Docks include all the risks encompassed within the enabling statute. Since the damage to the nitrolime was within the class of risks for which insurance could be obtained under the statute, CSV asserts that USF&G is liable under the policy notwithstanding the exclusions contained therein. In the alternative, CSV argues that this result was achieved by USF&G's special endorsement to the policy which purported to conform the policy to the enabling statute. CSV further contends that none of the exclusions which USF&G contends preclude recovery under the policy are applicable, or that at least a factual question remains which renders the granting of summary judgment improper.[6]

---

must proximately cause the damages and injuries.

The only thing that we would like is an instruction on that, that it goes to Count One on the tort action and that negligence is not necessarily an element under Count Two." The record discloses that the appellant's counsel also requested a written instruction with respect to the Coast Guard regulations. The court rejected the submitted charge because the appellant had failed to demonstrate the applicability of the regulations. We agree with the action of the district court.

**6.** The relevant portions of the policy provides that USF&G shall be liable for injury to or destruction of property for which the State Docks would become legally obligated to pay, except that the policy shall not apply:

"(h) * * * to injury to or destruction of [property] * * * (3) except with respect to liability under such sidetrack agreements or the use of elevators or escalators at premises owned by, rented to or controlled by the Named Insured, property in the care, custody or control of the Insured or property as to which the Insured for any purpose is exercising physical control. * * *

"(i) * * * to any of the following insofar as any of them occur on or from premises owned by or rented to the named Insured and injure or destroy buildings or property thereon:

"(1) the discharge, leakage or overflow of water or steam from plumbing, heating, refrigerating, or air-conditioning systems, standpipes for fire hose, or industrial or domestic appliances, or any substance from automatic sprinkler systems,

\* \* \* \* \*

provided, however, this exclusion does not apply * * * to operations performed by independent contractors, * * * "

\* \* \* \* \*

ENDORSEMENT

"It is agreed that such insurance as is afforded by the policy applies subject to the following Provisions:

"The company agrees that it will not use, either in the adjustment of claims, or in the defense of suits against the insured, the immunity of the insured from tort liability, unless requested by the insured to interpose such defense.

"The insured agrees that the waiver of the defense of immunity shall not subject the company to liability from any portion of a claim, verdict, or judgment in excess of the limits of liability, stated in the policy."

\* \* \* \* \*

"Now, therefore, in consideration of premium at which this policy is written it is agreed between the said department and the said insurance company, as follows:

"(1) The attached policy issued in all respects subject to the said Act of the Legislature of Alabama #455, approved July 6, 1945 and

(2) Anything in the attached policy or in any rider or endorsement attached thereto the contrary notwithstanding, there shall be a direct right of action

USF&G argues that the statute which authorizes the State Docks to procure insurance does not require that the insurance coverage obtained include all the risks encompassed within the statute, but rather that the statute confers discretion upon the State Docks to obtain such insurance as the department sees fit. It also denies that the endorsement extends the policy's coverage to the entire class of risks for which insurance might be obtained under the statute. It finally argues that the exclusions are clearly applicable by their terms, and that, on the state of the record both at the time summary judgment was granted and when judgment was entered for Walsh, no fact questions existed.

 The applicable provisions of the statute [7] which permits the State Docks to obtain insurance coverage provides that insurance may be obtained for damage to the property of others in the custody and control of the State Docks and that the insurer's liability shall be the same as if the Docks were a private person, subject to the express limitations of the policy. The statute was enacted to ameliorate the hardships and inequities caused by the exemption of the State Docks from suit under the umbrella of the State of Alabama's sovereign immunity.[8] It authorized the department to obtain insurance coverage for the risks enumerated in the statute. The entire statute is couched in permissive tones, and we believe that its proper construction permits the department to procure insurance of such limited nature and type as it, in its sole discretion, shall determine.[9] We base this holding both on the permissive language used in the statute, and the concluding portion of the statute which provides that liability shall be the same as imposed on a private person, "except to the extent expressly stated to the contrary" in the policy. Thus, we believe that the statute clearly contemplates limited insurance coverage and we can not accept CSV's contention that the statute requires coverage for all the risks encompassed within it. Therefore we conclude that CSV's rights against USF&G are controlled by the policy and limited by its exclusionary provisions.

 Similarly, we believe that USF&G did not intend to, and did not, expand the coverage afforded by the pol-

---

and suit against the insurance company issuing the policy for the enforcement of any claims or causes of action covered by the said policy and any immunity of the said board from suit shall not in any manner be a defense to any such suit against the company, within the limits prescribed in the said policy to be as contemplated by said law."

7. The statute reads as follows:
"The department of state docks and terminals is hereby authorized to provide insurance covering loss of damage to its properties, or any properties of others in its custody, care or control, or any properties as to which it has any insurable interest, caused by fire or other casualty; and may likewise provide insurance for the payment of damages on account of the injury to or death of persons, and the loss of or destruction of properties of others, and may pay premiums thereon out of the revenues of the department. * * * [A]ny contracts of insurance herein authorized may, in the discretion of the director of the department provide for a direct right of action and suit against

the insurance carrier for the enforcement of any such claims or causes of action. * * * [T]he liability * * * [from any] * * * policy or contract of insurance, except to the extent expressly stated to the contrary therein shall be the same as that imposed upon private persons, firms, or corporations in like circumstances." Title 38, § 24 (1), Code of Alabama (1940).

8. The immunity of the State Docks from suit under the doctrine of sovereign immunity was firmly established in State Docks Comm'n v. Barnes, 225 Ala. 403, 143 So. 581 (1932). The Supreme Court of Alabama there held that suit against the State Docks was precluded by Art. 1, § 14 of the Alabama Constitution.

9. We limit this holding to the facts of this case, and in no way reflect upon the interrelation of this statute with Alabama's Workmen's Compensation law. Insurance coverage obtained by the State Docks under Chapter 5 of Title 26 of the Code of Alabama is controlled by specific language of the statute not now before us, and we do not here undertake to construe that portion of the statute.

534

icy to the entire class of risks encompassed in the enabling statute by its special endorsement. It is manifest from a reading of the endorsement that it was designed to remove any doubts and to insure a direct right of action against the insurance company. The purpose of the endorsement was to make it clear that the defense of sovereign immunity would not be interposed by the insurance company in any claim under the policy, and to obviate the necessity of obtaining a judgment against the insured before recourse could be had against the company. As such the endorsement does not extend the scope of the policy's coverage, nor does it aid CSV's attempt to circumvent the exclusions of the policy.

Exclusion h(3) [10] excises from the coverage of the policy damage to "property in the care, custody or control of the Insured or property as to which the Insured for any purpose is exercising physical control." USF&G asserts that the nitrolime was clearly within the care, custody or control of the State Docks at the time it was damaged and that therefore, CSV is precluded from recovering under the policy. It also contends that on the basis of CSV's complaint, its motion for summary judgment and supporting affidavit, and Walsh's answer, no material question of fact existed as to the applicability of the exclusion.

 Under Alabama law it is well settled that insurance policies are to be construed in a manner most favorable to the insured, McKee v. Exchange Ins. Ass'n, 270 Ala. 518, 120 So.2d 690 (1960) and that when a policy is susceptible of two or more constructions, the one most favorable to the Insured should be adopted. Trans-Continental Mut. Ins. Co. v. Harrison, 262 Ala. 373, 78 So.2d 917, 51 A.L.R.2d 917 (1955). However, when the language of a policy is clear and unambiguous, it is to be construed as it reads, and "[the] courts are not at liberty to raise doubts where none exists." Trinity Universal Ins. Co. v. Robert P. Stapp, Inc., 278 Ala. 209, 177 So.2d 102, 104 (1965).

 Although undoubtedly there are some circumstances in which there may be some question whether certain property is in the care, custody, or control of a party, we believe that under the facts and in the circumstances of this case no such ambiguity or uncertainty exists. The fertilizer was stored in the Center C. warehouse by Walsh in September 1959. It remained there until some time after the damage here in issue occurred. The storage was under the supervision of the State Docks and the manner in which the fertilizer was stored was subject to the control of the State Docks. Access to the fertilizer was also subject to the control of the State Docks. The State Docks issued a warehouse receipt to Bradley & Baker at the time the fertilizer was stored. Under Alabama law, the State Docks was a bailee for hire, Farmers' Union Warehouse Co. v. Barnett, 214 Ala. 202, 107 So.2d 46 (1926), and CSV so alleged in its complaint. The State Docks had a possessory lien on the nitrolime for the storage charges, Title 2, § 532, Code of Alabama (1940), and a property right in the bailment, Montgomery Gas-Light Co. v. Montgomery & E. Ry., 86 Ala. 372, 5 So. 735 (1889); as a bailee it had the right to possession and control of the fertilizer. Maryland Gas Co. v. Holmsgaard, 10 Ill.App.2d 1, 133 N.E.2d 910. Indeed, CSV alleged in its complaint that the nitrolime was in the State Docks' "possession, custody and control from the date of storage * * * until the date of damage." Though standing alone each of these factors might not be sufficient to establish that the nitrolime was in the care, custody or control of the State Docks, taken together they preclude any other conclusion. Knight v. L. H. Bassier, Inc., 118 So.2d 700 (La.App.1960); International Derrick & Equip. Co. v. Buxbaum, 240 F.2d 536, 62 A.L.R.2d 1237 (3 Cir. 1957); see Annot. 62 A.L.R.2d 1242 (1957) and Late Case Service. Thus, we conclude

10. See footnote 6 supra.

that exclusion h(3) is applicable to the case before us, and precludes CSV from recovering against USF&G under the policy.

In view of our disposition of this issue, we need not consider CSV's other contentions with respect to the other exclusionary provisions of the contract.

The judgment is affirmed.