As the majority states, Dewey Saxon, a business invitee of the Alabama State Docks ("ASD"), sued the ASD, its director, certain other Docks officers and employees (ASD defendants), and Paul Hunt, an Underwriter at Lloyd's of London, individually and as representative of all other Lloyd's Underwriters subscribing to a policy of insurance (the Underwriter defendants), seeking damages for personal injuries received on the premises of the Docks. Saxon's wife also sued.
The Saxons specifically alleged that their action against the insurance carriers named in the complaint was "brought pursuant to § 33-1-25, [Ala. Code 1975], which authorizes a direct action against said parties".
The ASD defendants filed a motion to dismiss the Saxons' action, claiming immunity *Page 949 
from suit under Article I, § 14, Constitution of Alabama of 1901.
The Underwriter defendants filed a motion to dismiss and a motion for summary judgment, arguing that the policy of insurance issued to ASD "does not provide for a direct right of action and that therefore the plaintiffs do not have a direct cause of action against [these] defendant[s] pursuant to . . . § 33-1-25."
Although the trial court first granted the Underwriter defendants' motion for summary judgment, it later granted the Saxons' motion to reconsider and then denied summary judgment to the Underwriter defendants, with an order providing in pertinent part:
 "After having heard oral argument by counsel for Plaintiffs and Defendants, having examined the applicable statutory law allowing the Alabama State Docks to purchase insurance providing coverage for [injuries] such as those sustained by the Plaintiff in this case (§ 33-1-25, Code of Alabama), and in consideration of the Court's denial of the motions for summary judgment filed by Defendants Alabama State Docks . . ., the Court is of the opinion that the plaintiffs' motion to reconsider the interlocutory order of summary judgment on behalf of 'the insurance defendants' is due to be granted and the summary judgment motions of said defendants are due to be denied.
 "However, the rulings on these motions regarding Lloyd's are correct only if the trial court is wrong in its ruling on the motion for summary judgment filed by the State Docks. There the Court denied the summary judgment sought by the Docks, because the Court found that the Docks had waived its sovereign immunity by purchasing the policy of liability insurance with knowledge of the provisions of the direct action statute but without inclusion of an express direct action term in the policy itself.
 "If this purchase by the Docks under these circumstances did not constitute a waiver of its sovereign immunity, then knowledge of the laws preserving the sovereign immunity of the Docks under these circumstances is imputed to Lloyd's of London in the sense that every person is deemed to know the law. Thus, at the time Lloyd's sold the policy to the Docks, Lloyd's knew that, because the Docks was immune, the only way the policy could be anything but a sham was for it to be construed as a direct action policy. Likewise, this very same knowledge is imputed to the Docks itself as of the time it purchased the policy.
 "With this knowledge, the Docks paid the premium for the policy; and Lloyd's accepted the premium and issued the policy. Thus, the minds of the parties met, either actually or constructively, to the effect that Lloyd's would be subject to direct action on the policy.
 "If Lloyd's contends that it sold the policy with the understanding that it would not be enforceable under any circumstances, then the Court will not countenance such a defense. Rather, the Court will deem that the minds met though the eyes winked."
The trial court granted both the ASD's motion and the Underwriter defendants' motion for leave to appeal from the interlocutory orders entered against them on their motions for summary judgment. Both the ASD defendants and the Underwriter defendants sought permission to appeal from the orders of the trial court, and this court granted both motions. Thus, presented squarely in these two appeals is this legal issue:
Are the ASD defendants entitled to absolute immunity under Article I, § 14, of the Constitution of Alabama, notwithstanding the procurement by the ADS of liability insurance as authorized by the legislature under § 33-1-25?
The majority holds that neither the legislature nor the ASD has the power to waive, either expressly or impliedly, the state's constitutional immunity under § 14. I agree that our cases have held that the state's constitutional immunity may not be waived, going back to State Docks Commission v. Barnes,225 Ala. 403, 143 So. 581 (1932). That immunity has been described as an "almost invincible wall." Hutchinson v. *Page 950 Board of Trustees of University of Alabama, 288 Ala. 20,256 So.2d 281 (1971). One can only speculate why the concern for the state treasury exceeds the concern for life and liberty, since we routinely hold that criminal defendants may waive constitutionally protected rights if they do not timely assert them. We also recognize that citizens of this State waive constitutional exemptions each time they sign a note at a bank. Bankers no doubt rely on these waivers routinely.
State Docks Commission v. Barnes was decided at the depth of the depression. The ASD did not, at that time, have express statutory authority to purchase liability insurance. In 1945, the legislature enacted § 33-1-25, which was enacted to eliminate the hardship and inequity caused by the shield of sovereign immunity as applied by this Court. Why should a citizen of this State who has been injured under circumstances that — but for its immunity — would create liability on the part of the ASD not be allowed to recover for his injuries where the ASD, under express statutory authority, has purchased liability insurance (with taxpayers' dollars) that provides coverage?
A growing number of states recognize a limited exception to sovereign immunity when the governmental treasuries are not at risk. The rationale for the holding of State Docks Commissionv. Barnes, supra, was expressly to protect the state treasury. There is no reason for the application of that rule when the treasury is no longer at risk. It is no longer at risk where the risk is covered by insurance and is limited to the extent of coverage afforded by the liability policy.
In the last few years, many states that, like Alabama, had not previously recognized a limited waiver of immunity where liability insurance was available, have now recognized that if liability insurance is available, sovereign immunity is no longer a bar to recovery up to the policy limits. As of 1991, the states were evenly divided, one half adhering to the view that tort liability is unaffected by the purchase of liability insurance and one half holding that immunity is removed by the purchase of liability insurance, to the extent of the policy coverage. See Annotation, "Liability or Indemnity Insurance Carried by Governmental Unit as Affecting Immunity From Tort Liability," 68 A.L.R.2d 1437 (Supp. 1991).[6]
The Wisconsin Supreme Court's explanation for its change of position is typical of the rationale given in cases from other states that have changed position. Because that court's views coincide with mine, I set out at some length that court's opinion in Marshall v. City of Green Bay, 18 Wis.2d 496,118 N.W.2d 715 (1963), which involved a suit for personal injuries brought against the City of Green Bay by a person injured allegedly as a result of the City's negligence in maintaining its premises:
 "In the case at bar, it is apparent the city intended to step down from its pedestal *Page 951 
of immunity. The policy of insurance was a contract between the city and the insurer. Its terms as alleged in the complaint provided the insurer would defend any action for damages against the city based on negligence. . . . The policy provided the insurer would not raise the defense of governmental immunity. This important provision of the liability policy is commonly understood to mean the insurer, who is in control of the defense, will not raise such defense on behalf of the insured against the claimant. The provision has no application to an action between the city and the insurer as a question of governmental immunity would not arise in such action. It applied rather to a claim or action by a claimant against the city, the defense or settlement of which the insurer controls. By the terms of the policy the city and the insurer agreed in effect to extend the coverage of the policy and to enlarge the scope of its insuring clause which a literal construction would otherwise limit to liability incurred beyond the city's immunity. True, this liability policy is a private contract between parties and normally would not concern third parties. Yet, in this instance the provision is in fact for the benefit of the claimants and the city — certainly not for the insurer. What else can the agreement not to raise the defense of governmental immunity mean? We construe this agreement to be a waiver of governmental immunity by the city recognized and agreed to by the insurer. Such immunity cannot be resuscitated by subsequent action of the city or the insurer, or both. Under such circumstances to allow the city to insist on its immunity by a defense controlled by the insurer would be a virtual fraud and a misuse of public funds. We need not place the result on ground of estoppel as we hold solely the defendant waived its immunity for such of its acts and those of its servants as are covered by the insurance policy pro tanto to the extent of the policy limits. . . .
 "The decisions of other jurisdictions on this question are in conflict. The older cases and the majority view hold the purchase of liability insurance does not constitute a waiver of governmental immunity. A growing minority of jurisdictions take a more realistic view of the problem and hold that governmental immunity is waived or removed to the extent that an insurance policy protects a municipality against tort liability which theretofore did not exist."
The Wisconsin opinion was written 31 years ago. Since that time, the number of states holding that governmental immunity is removed to the extent that an insurance policy protects the governmental coffers against tort liability has grown to 20. Because the legislature has expressly authorized the ASD to purchase insurance, and because the ASD has done so with public funds, I believe the State of Alabama should join those states and take a realistic view of what is actually occurring.
The trial judge in this case, concerned about reality, noted:
 "If this purchase of insurance by the Docks under these circumstances did not constitute a waiver of its sovereign immunity, then knowledge of the laws preserving the sovereign immunity of the Docks under these circumstances is imputed to Lloyd's of London in the sense that every person is deemed to know the law. Thus, at the time Lloyd's sold the policy to the Docks, Lloyd's knew that because the Docks was immune, the only way the policy could be anything but a sham was for it to be construed as a direct action policy. Likewise, this very same knowledge is imputed to the Docks itself as of the time it purchased the policy.
 "With this knowledge, the Docks paid the premium for the policy; and Lloyd's accepted the premium and issued the policy. Thus, the minds of the parties met, either actually or constructively, to the effect that Lloyd's would be subject to direct action on the policy.
 "If Lloyd's contends that it sold the policy with the understanding that it would not be enforceable under any circumstances, then the Court will not countenance such a defense. Rather, the Court will deem that the minds met though the eyes winked." *Page 952 
For the reasons stated, I agree with the trial court, and I disagree strongly with the majority's holding that neither the statute nor the liability policy permits a direct action by the Saxons against the Underwriter defendants.
The Legislature passed § 33-1-25, specifically authorizing the ASD to provide insurance covering just such injuries as the plaintiffs in this case alleged they have suffered. This statute states:
 "The State Docks is hereby authorized to provide insurance covering the loss or damage to its properties, or any properties of others in its custody, care, or control, or any properties as to which it has any insurable interest, caused by fire or other casualties; and may likewise provide insurance for the payment of damages on account of the injury to or death of persons, and the loss of or the destruction of properties of others; and may pay the premiums thereon out of the revenues of the Department. Nothing herein shall be construed to authorize or permit the institution of any civil action or proceeding in any court against the Department for or on account of any matters referred to in this Section; provided that any contracts of insurance herein authorized may, in the discretion of the Director of the Department, provide for a direct right of action against the insurance carrier for the enforcement of any such claim or causes of action . . . The liability in all other cases from any such policy or contract of insurance, except to the extent expressly stated to the contrary therein, shall be the same as that imposed by law upon private persons, firms, or corporations in like circumstances."
This statute thus authorizes the ASD to purchase contracts of insurance that will provide liability coverage and provides that "[t]he liability . . . from any such policy . . . shall be the same as that imposed by law upon private persons" — "except to the extent expressly stated to the contrary" in the policy. This statute has been described as remedial legislation enacted "to ameliorate the hardships and inequities caused by the exemption of the State Docks from suit under the umbrella of the State of Alabama's sovereign immunity." CentraalStikstof Verkoopkanter, N.V. v. Walsh Stevedoring Co.,380 F.2d 523 (5th Cir. 1967).
The statute specifically addresses the ASD, and recognizes the hardship and inequities that occur when persons like these plaintiffs are injured under circumstances that would render the ASD liable except for the protection afforded the ASD and other state agencies under § 14 of the Constitution. As the majority correctly holds, the legislature cannot, by statute, restrict the scope of the immunity afforded the State and state agencies by the Constitution. But the legislature can pass, and it has passed, legislation ameliorating the harshness of the imposition of constitutional immunity when the ASD, with taxpayer money, has purchased liability insurance that expressly covers exactly the kind of injury allegedly suffered by the Saxons in this case. The statute authorizes a direct action against the insurer, and the policy here contains the following provision:
"WAIVER OF SOVEREIGN IMMUNITY
 "With respect to such insurance as is afforded by this Policy it is agreed that:
 "A. Underwriters will not use, either in the adjustment of claims or in the defence of suits against the Assured, the 'Sovereign Immunity' of Assured from tort liability except upon written request of the Named Assured.
 "B. The Assured agrees that the waiver of the defence of 'Sovereign Immunity' shall not subject Underwriters to liability for any portion of a claim, verdict, or judgment in excess of the limits of liability stated in this Policy."
I would hold that the ASD, by exercising the authority expressly granted to it by the legislature in § 33-1-25, has purchased a liability policy that expressly covers the claim made by the Saxons. To the extent that the ASD has bought and paid for this coverage, it should be held to have waived its sovereign immunity to the extent of the coverage provided by the policy. I would also hold that the Saxons may maintain a direct action against the insurer on that policy. If the *Page 953 
Saxons are foreclosed from maintaining an action against the ASD because of the "almost invincible wall" of sovereign immunity and are foreclosed from maintaining an action against the insurer because they cannot reduce to judgment a claim against the ASD, then the people of Alabama have been victimized by the joint fraud of the ASD and the insurer, because the taxpayers' premium would have bought nothing.
The majority says, "[W]e cannot say that the liability insurance policy is a sham. Certainly, the State Docks has the right to protect itself in the event of any unforeseen changes in the law that might be adverse to it." Op. at 948. The Lloyd's policy did not insure against "unforeseen changes in the law that might be adverse" to the ASD. It insured against the very claim asserted against the ASD by the Saxons. There is nothing in the law or public policy that compels us to conclude that the ASD and Lloyd's of London set out to deliberately cheat the citizens of this State by issuing a policy that offers no more coverage than protection "in the event of any unforeseen changes in the law."
For these reasons, I dissent.
[6] In the 1966 case of Thompson v. Druid City Hospital Board,279 Ala. 314, 184 So.2d 825 (1966), this Court noted that the then "prevailing view" was confirmed by the number of cases cited in the annotation at 68 A.L.R.2d 1437. 279 Ala. at 315,184 So.2d at 826. Review of that annotation confirms that Alaska, Arkansas, California, Georgia, Idaho, Iowa, Maryland, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Pennsylvania, Texas, Virginia, West Virginia, Wisconsin, and Wyoming (20 states) subscribed to the "prevailing view." 68 A.L.R.2d at 1439-40. At that time, Illinois, Kentucky, and Tennessee subscribed to the minority view (described by the author of the annotation as "worthy of characterization as enlightened") 68 A.L.R.2d at 1448-49.
However, the cases cited in the A.L.R. Later Case Service for this annotation reveal a significant shift in how the states view the consequence of their governmental entities' purchase of liability insurance. According to the Later Case Service, the states now adhering to the view that tort immunity is unaffected by the procurement of insurance include Alabama, Florida, Georgia, Illinois, Indiana, Kansas, Maryland, Michigan, Missouri, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Dakota, Texas, West Virginia, and Wisconsin (19 states). Id. However, many states have crossed over by recognizing that immunity is removed to the extent of policy coverage. These states include Delaware, Florida, Georgia, Illinois, Indiana, Kentucky, Maine, Minnesota, Missouri, Montana, Nebraska, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Tennessee, Vermont, Wisconsin, and Wyoming (20 states). Id. Thus, 20 states now adhere to the view urged by the Saxons, namely, that immunity should be deemed waived, at least to the extent liability insurance is available to cover the risk.