Mrs. Hilda CASE et al., Plaintiffs,

v.

MONSANTO CHEMICAL CO. et al., Defendants and Third-Party Plaintiff,

v.

SMITH PETROLEUM SERVICE, INC., Third-Party Defendant.

Civ. A. No. 3513.

United States District Court
S. D. Mississippi,
Jackson Division.

Dec. 14, 1967.

Owen Roberts, Brookhaven, Miss., and Alfred N. Crisler, Jackson, Miss., for plaintiffs.

Daniel, Coker & Horton and Butler, Snow, O'Mara, Stevens & Cannada, Jackson, Miss., for defendants.

## OPINION OF THE COURT

DAN M. RUSSELL, Jr., District Judge.

Plaintiffs, the heirs at law of Paul Case, deceased, filed suit in the First Judicial District of the Circuit Court of Hinds County, Mississippi, against Monsanto Chemical Company, hereinafter called Monsanto, and its production foreman, C. H. Barfield, for the death of Case, an employee of Smith Petroleum Service, Inc., hereinafter called Smith, which company had been employed by Monsanto to perform a work-over job on Monsanto's oil well, Lucien #1, in the Brookhaven Field in Lincoln County, Mississippi. Plaintiffs alleged that on the date of decedent's death, May 24, 1963, while the crew was in the process of pulling tube, and while the decedent was up in the derrick racking pipe, there occurred an overflow of a quantity of oil which ignited from the exhaust of a butane motor, and a flash fire ensued engulfing decedent and burning him to death. Plaintiffs charged that Smith's crew was acting under the direct control and supervision of Barfield, and through him Monsanto failed to direct and require the use of appropriate procedures to prevent a blow out of oil and gas from said well; failed to reasonably protect against the hazard of fire at the well site in allowing a butane gas motor, a part of the work-over rig, to operate in close proximity to the well; and that such negligence was the direct and proximate cause of Case's suffering and death.

Process not having been served on Barfield, and there being doubt as to whether he was a resident of Mississippi, Monsanto removed the action to this court on grounds of diversity of citizenship, and filed an answer and third-party complaint against Smith. In its answer, Monsanto averred that Smith was an independent contractor, not under the direct control of Barfield, and that it was the Smith crew's negligence which caused the death of Case, in failing, when the well first began to head, to insert a stabbing valve and in failing to shut down the operation, including cutting off the motors. Among other defenses, Monsanto pled that Case assumed the risk, and, alternatively, that Case was a loaned servant to Monsanto, and, if Monsanto should be found as having directed the activities of Smith's crew, then plaintiffs' exclusive remedy was under the Mississippi Workman's Compensation Act.[1] In its third-party complaint Monsanto alleged that, if

---

1. 6998–05. Exclusiveness of liability.—The liability of an employer to pay compensation shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next-of-kin, and anyone otherwise entitled to recover damages at common law or otherwise from such employer on account of such injury or death, except that if an employer fails to secure payment of compensation as required by this act, an injured employee, or his legal representative in case death results from the injury, may elect to claim compensation under this act, or to maintain an action at law for damages on account of such injury or death. In such action the defendant may not plead as a defense that the injury was caused by the negligence of a fellow servant, nor that the employee assumed the risk of his employment, nor that the injury was due to the contributory negligence of the employee.

it be found liable to plaintiffs, it was entitled to indemnity from Smith for all damages awarded to plaintiffs, attorney fees and expenses, on the grounds that Smith impliedly warranted to Monsanto that Smith's crew possessed the necessary skill to perform the job, that Smith would provide its workmen with a reasonably safe place to work, and that the members of Smith's crew were schooled in safety procedures, including emergency methods of escape, and would comply with standard safety precautions.

The Travelers Insurance Company, herein called Travelers, intervened as Smith's compensation carrier to protect its right of subrogation for benefits paid in the sum of $3,117.05 and to be relieved of any further payments in view of a pending settlement between plaintiffs and Monsanto. Thereafter, on motion of plaintiffs to dismiss their suit against Monsanto because of a settlement of their claim in the sum of $25,000.00, this Court sustained the motion, allowed the intervention of Travelers, denied payment to Travelers of its subrogation claim out of the settlement proceeds, but preserved its subrogation rights pending a final judgment on the third-party suit, directed that Travelers be relieved of any further compensation payments, and allowed Travelers ten days in which to take an interlocutory appeal from the order. This appeal was denied by the Fifth Circuit. On the basis of this action, Monsanto denied owing Smith's subrogation claim, and filed an amended third-party complaint, setting forth the fact of the settlement with plaintiffs, and in addition to claiming indemnity against Smith for a failure of the implied warranties set forth above, alternatively charged that Smith's negligence was active, and Monsanto's passive only. Monsanto also amended to show that its comprehensive liability insurer, Liberty Mutual Insurance Company, hereinafter called Liberty, had paid $25,000.00, the amount of the settlement and Monsanto's attorney fees and expenses in the sum of $10,734,35, and that, under a policy providing for premium payments on a retrospective basis, had paid a total of $53,186.00 on this claim, which sum had in fact been paid by Monsanto to Liberty, and which is the total of the indemnity claim against Smith. Liberty joined Monsanto as a third-party claimant. Smith, in answering the amended third-party complaint, re-affirmed its previous denials of liability, and averred that Monsanto's payment to the Case heirs was a voluntary settlement in recognition of its own negligence, and for which it has no right of indemnity.

Although the case went to trial on only the amended third-party complaint and on Smith's subrogation claim for compensation benefits paid by it to the original plaintiffs, it is necessary to consider all the pleadings as outlined above, for unlike many instances in which a court or jury had previously determined the facts upon which to fix the extent of negligence, if any, of the original defendant, no such determination has been made here, and this Court is not relieved of its burden to examine the entire litigation and make a finding of facts upon which conclusions of law can be drawn.

Monsanto, through its general field superintendent, Marvin McGraw, orally employed Smith, through its manager, J. L. Francis, to do a work-over job on Monsanto's Lucien No. 1 well in the Brookhaven Oil Field, Lincoln County, Mississippi, with Smith furnishing the crew, the rig, and the tools necessary to do the job. The contract did not expressly provide for indemnity in case of injury. On May 21, 1963, the Smith crew, consisting of J. L. Walker, operator, and three helpers, changed the pump which did not bring forth production. On the following day, the pump was changed again with no favorable results. It was then agreed that the pipe would have to be pulled. The tubing constituted a "wet string," and according to Smith, a procedure was agreed upon by which salt water would be put in the well, a standing valve be dropped, and the tubing be filled with salt water. McGraw also informed Francis that his superior, Charles H. Barfield,

a petroleum engineer and production foreman for Monsanto, was in the field. Barfield, recently assigned to the area, learned on the 22nd that the pump was being changed for the second time. On the morning of May 23rd, when the second pump was unsuccessful, Barfield and McGraw went into Brookhaven to call their home office for instructions. Barfield stated that it was his decision that the pipe would have to be pulled. A dialog service was run to determine which tubes either leaked or needed to be replaced, and Barfield furnished Francis a written procedure for pulling the tube. This memo, despite efforts by Monsanto to locate a copy, was not available at the trial. It was Barfield's decision that the standing valve be dropped first, and 50 barrels of salt water be added afterwards. Barfield denied any knowledge of any procedure agreed upon by McGraw and Francis. McGraw did not testify at the trial, and Francis, who was not present at the well during the dropping of the valve and insertion of salt water, denied that he knew the procedure had been changed. Experts for Monsanto testified that putting salt water ahead of the standing valve could damage the well and add nothing to saftey procedures. Smith's witnesses testified contrary-wise.

Although he denied supervisory authority over the crew in his pleadings, Barfield conceded in his testimony his over-all authority to have the dialog survey run in order to determine the faulty tubing to be replaced, to see that the crew in pulling the packer did not exceed the maximum pull, and to direct the crew to drop the standing valve and add salt water. He denied that he had any authority as to the individual members of the crew or the manner in which they would perform their various functions. He denied that it was his or Monsanto's duty to instruct the crew in safety procedures. He further stated that the location of the draw-works motor tied down to eyes imbedded in the concrete floor of the well area furnished by Monsanto, was a normal place for it to be and would have presented no fire hazard had the crew exercised proper safety procedures.

Prior to the morning of May 24, the dialog survey had been run, the packer had been unseated and the standing valve and salt water had been inserted. On the morning of the 24th, Barfield directed the crew to shut down the operation until blow-out preventers were installed on the casing, and until stabbing valves were at hand on the derrick floor. He remained in and around the vicinity of the well all during the day, and at the time of the fire was sitting in his car some 150 feet from the well site doing paper work. Francis was there for a while but left before the fire. As the crew pulled the 34th and 35th joints, they said 3 to 4 gallons of dark, brown fluid spilled out from the bottom and a small amount flowed over the collar of the next joint. They immediately stopped the operation and shut off the draw-works motor, but left running a smaller motor located some 20 to 40 feet from the well head. Walker, Smith's foreman, instructed the crew to get the stabbing valves ready but these were not applied. The crew waited 5 to 10 minutes to see if the flow abated. Case came down from the derrick. At the end of this interval, the flow having stopped, Walker decided to proceed. Case returned to the derrick. As the 36th joint was raised some 15 feet, or about half its length above the derrick floor, oil gushed out and up into the derrick. The crew tried to lower the pipe, set the elevator slips and use a stabbing valve, but Walker said the pressure was too great. Both motors were shut off, but not before the spreading oil ignited from the motor exhaust. Flames shot up through the derrick, creating a momentary holocaust and burning Case to death.

There is no question of Smith's negligence. Francis and Walker conceded that they gave the crew no specific safety instructions as each man was supposed to be an experienced oil field worker and capable of taking care of himself; conceded that no safety line had been provided as an escape route other than the guy lines from the outside of the derrick

to the ground; nor was Case instructed to come down if oil began flowing. In the event of a flow, the purpose of the stabbing valves was to control the flow. The Court finds that the failure of the crew to install the stabbing valve in the interval following the first flow, and thereby allowing the well to become out of control may well have been one cause of the fire.

Monsanto's negligence was not so patent, but there were several areas in which a jury could have found Monsanto liable, a risk Monsanto obviously appreciated in making its settlement with the Case heirs. It is undisputed that with respect to working hours, job assignments, etc., Barfield had no control over Smith's crew. However, he was a petroleum engineer with experience in the oil field and was in charge of outlining to Smith and its supervisory employees the over-all procedure in the work-over job. Although he had not been to the Lucien No. 1 well prior to May 22, 1963, Barfield was familiar with the formation and the well history. Barfield himself determined that 50 barrels of salt water was to be inserted after the standing valve. Whether a portion was put in before or after the standing valve does not impress the Court as much as does the question of whether enough salt water was put in to prevent the well's heading. The salt water was delivered to the well site by Smith Gravel Service, a separate entity from defendant Smith. Barfield, Francis and Walker each denied that he ordered the water. It is conceded that one load of 25 barrels was put in the well on the afternoon or evening of May 23rd. Neither Barfield nor any other witness testified that a second load was added, although Monsanto was billed for 2 loads. None was added on May 24th prior to the fire. Since it was believed that the difficulty with the well was due to leaks in the tubing, it is significant to the Court that whatever amount of water was added, the well sat overnight and into the next morning with no verification of the salt water level before the tube pulling started. It

can only be concluded that enough was not added, or that it leaked out, or, being heavier than oil, settled below the oil in the tubing at about the 34th or 35th joint. As the amount of water necessary was Barfield's calculation based on his engineering knowledge, the Court finds that he had a corresponding duty to see that enough was in the well before the crew pulled the tube.

As McGraw did not testify, there was no evidence to indicate one way or the other whether Monsanto was satisfied with the competency of the Smith crew. However, Monsanto did furnish the working area for this crew, including the location of the eyes imbedded in the concrete floor to which the crew attached their rig. It was conceded that the rig, including the draw-works motor, would have been as operable if placed further from the well-head than it was, thereby reducing the hazard of oil splashing on or around the motor. Neither McGraw nor Barfield felt it necessary to suggest such a move, yet Barfield did insist on a cessation in the tube pulling until blow-out preventers were installed and stabbing valves were present on the floor of the well. Barfield denied that he was aware of the spillage between the 35th and 36th joints or the cutting off of the motor and work stoppage, yet he was there in his car at a crucial time in the operation where he could and said he would have directed some procedure other than losing control of the well had he known it.

The Court finds that the omissions of responsibility assumed by Monsanto, in not seeing that the procedures outlined by its supervisory employees were carried out, were negligence and could have been the proximate cause of the unexpected flow of oil resulting in the flash fire and fatal injuries to Case.

The Court has examined many cases involving points applicable in some respect to this action. In Ryan Stevedoring Co. v. Pan-Atlantic Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 where a stevedore received a jury verdict against a shipowner, although he was compensated by his employer, the Court

allowed the shipowner indemnity against the employer, not on the grounds of a contribution from a joint tort feasor, but on the grounds that the employer's negligence was a breach of its duty to the owner to properly stow cargo, the omission of which caused the injury. Similarly, it was said in Weyerhaeuser S. S. Co. v. Nacirema Operating Co., 355 U.S. 563, at page 567, 78 S.Ct. 438, at page 441, 2 L.Ed.2d 491: "If in that regard respondent rendered a substandard performance which led to foreseeable liability of petitioner, the latter was entitled to indemnity *absent conduct on its part sufficient to preclude recovery*." (Italics added).

In Italia Soc. etc. v. Oregon Stevedoring Co., 376 U.S. 315, 321, 84 S.Ct. 748, 752, 11 L.Ed.2d 732, the Court said: "Recovery in contribution is imposed by law and is measured by the relative fault of the joint tortfeasors or shared equally between them, * * * ; while recovery in indemnity for breach of the stevedore's warranty is based upon an agreement between the shipowner and stevedore and is not necessarily affected or defeated by the shipowner's negligence, whether active or passive, primary or secondary."

In Bowyer & Johnson Construction Co. v. White, 5th Cir., 255 F.2d 482, a subcontractor who failed to comply with an implied agreement with its contractor to perform in a workmanlike manner, this failure being the cause of a fire that destroyed another's property, was required to make good the loss imposed on the contractor. The contractor was guilty of no negligence itself except as imputed to it by the act of the subcontractor.

A recent maritime case, Lusich v. Bloomfield Steamship Co., 5th Cir., 355 F.2d 770, lends considerable help to this Court. In that case an employee of a shoreside ship repair contractor brought a maritime tort action against the shipowner for personal injuries while aboard its ship. The owner filed a third-party complaint against the contractor claiming indemnity for a breach of the contractor's implied warranty of workmanlike service. The trial court instructed a verdict against the employee on the ground that the shipowner had relieved itself of responsibility for negligence by surrendering control of the working area to the contractor, and denied recovery on the third-party complaint, including the owner's claim for expenses in defending the suit. The appellate court reversed and remanded holding that the employee's complaint raised a jury issue as to whether the shipowner was negligent, and that the shipowner was not entitled to a judgment on its third-party action as a matter of law, but should be granted a new trial on the question of indemnity after the issues dealing with the plaintiff's claim have been determined.

The Court finds that Monsanto and Smith were equally guilty of negligence. It is the Court's opinion that Smith should bear one-half the cost of Monsanto's settlement and attorney fees and expenses, being one-half of $35,734.35, to be reduced by the compensation benefits paid by Smith's compensation carrier.

An order may be drawn to this effect.