**SMITH PETROLEUM SERVICE, INC.,**
**Appellant,**

v.

**MONSANTO CHEMICAL COMPANY**
**et al., Appellees.**

**MONSANTO CHEMICAL COMPANY**
**et al., Appellants,**

v.

**SMITH PETROLEUM SERVICE, INC.,**
**Appellee.**

**No. 26137.**

United States Court of Appeals
Fifth Circuit.

Jan. 7, 1970.

Junior O'Mara, Jackson, Miss., for appellant-appellee, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, Miss., of counsel.

Joe H. Daniel, L. F. Sams, Jr., Daniel, Coker, Horton & Bell, Jackson, Miss., for appellees-appellants.

Before COLEMAN and GOLDBERG, Circuit Judges, and SKELTON, Judge of the Court of Claims.*

GOLDBERG, Circuit Judge:

In this diversity case involving indemnity between Mississippi tortfeasors, we consider the landward thrust of the ad-

miralty doctrine enunciated in *Ryan.*[1] Even with sextant and compass we are unable to sight any estuary leading to *Ryan.* Looking to the law of Mississippi, we find *Ryan* rejected and indemnity denied.

This case originated as a wrongful death action growing out of an oil field fire which occurred on May 24, 1963. On that day Paul Case, an employee of Smith Petroleum Service, Inc. (Smith), was fatally burned while working atop an oil drilling rig in the Brookhaven Field in Lincoln County, Mississippi. Smith was employed by Monsanto Chemical Company (Monsanto) to perform a workover job on Monsanto's Lucien No. 1 well in the Brookhaven Field. The work at the well was done pursuant to an oral agreement entered into by Monsanto's field superintendent, Marvin McGraw, and Smith's manager, J. L. Francis. This agreement, which included no specific provision for indemnity in the event of an injury, contemplated that Smith would provide the necessary crew, tools, and rig for the job.

Work was commenced on May 21, 1963, when the crew changed the pump in an attempt to make the well produce. When this proved unsuccessful, the pump was changed for a second time, but the result was again unsatisfactory. When Charles Barfield, production foreman for Monsanto, was advised of the situation, he ordered a dialog test run to determine whether any tubing in the well leaked or needed to be replaced. On the basis of the dialog test, he decided to have the tubing pulled so that certain lengths of tubing could be replaced.[2]

McGraw and Francis agreed upon a plan to be used in pulling the tubing: salt water would first be poured into the well, then a standing valve would be dropped, and finally the tubing would

---

* Sitting by designation as a member of this panel.

1. Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133.

2. Barfield testified that he gave Francis a written memorandum concerning the procedure to be followed in pulling the tubing, but neither Barfield nor Monsanto was able to produce a copy of it at trial. Francis denied receiving any written memorandum.

be filled with salt water. Barfield, however, decided to drop the standing valve first and add fifty barrels of salt water later. At trial Monsanto experts testified that putting the salt water in ahead of the valve would damage the well; Smith experts testified to the contrary.

When the actual pulling of the tubing began on May 24, the valve and the salt water had already been inserted in the well under Barfield's direction. At one point on May 24 Barfield ordered the operation shut down temporarily while blowout preventers were installed in the casing and stabbing valves were brought to the derrick. He also instructed the Smith employee who was operating the motor that he was not to exceed a specified pulling power while removing the tubing from the well. After requesting these safety measures, Barfield left the well site for a time. Upon returning he parked his car about 150 feet from the well and remained in the car, doing paper work which was apparently unrelated to the work on the well.

The Smith crew proceeded to remove the tubing at the well site, and as the thirty-fourth and thirty-fifth joints were pulled to the surface they noticed a brown fluid spilling from the joints. They immediately ceased the operation, and the motor that operated the draw works was shut down. But when the flow from the tubing ceased after a few minutes, Smith's foreman ordered the operation resumed. Then, as the thirty-

sixth joint was raised to about fifteen feet above the derrick floor, oil gushed from the tubing into the derrick. Because of the tremendous pressure from the hole the crew was unable to lower the tubing. Oil came in contact with the draw-works motor exhaust and ignited. Mr. Case, who was working on the derrick, was engulfed by the flames and killed.

Smith paid workmen's compensation benefits to Case's family, and thereafter Case's widow instituted suit against Monsanto [3] in the Circuit Court of Hinds County, Mississippi. Monsanto removed the case to the United States District Court for the Southern District of Mississippi on the ground of diversity of citizenship and filed a third party complaint against Smith.[4] On June 28, 1965, Travelers Insurance Company (Travelers), Smith's workmen's compensation carrier, filed a petition to intervene, seeking to recover the sum Travelers had paid to Case's survivors and beneficiaries under the Mississippi Workmen's Compensation Act.

On July 10, 1965, Mrs. Case and Monsanto entered into a provisional settlement for $25,000.00. They then moved the district court to approve the settlement. The court did approve the settlement on August 27, 1965, dismissing Mrs. Case's claim against Monsanto without prejudice to the right of Travelers to pursue its subrogation claim. The case proceeded to trial with Monsanto's claim against Smith and Travelers' claim for reimbursement still to be decided.[5]

---

3. To be technically accurate, Mrs. Case was not the sole plaintiff; she and her children were plaintiffs. Moreover, Monsanto was not the sole defendant; both Monsanto and its foreman, Barfield, were parties defendant. For convenience throughout this opinion, however, we will refer to "Mrs. Case" as if she were the sole plaintiff, and we will refer to "Monsanto" rather than "Monsanto and Barfield."

4. The procedural and pleading aspects of this case are set out in greater detail in the opinion of the court below. Case

v. Monsanto Chemical Company, S.D. Miss.1967, 277 F.Supp. 287.

5. In the interim Liberty Mutual Insurance Company filed a third party complaint as "one of two real parties in interest in the claim" asserted by Monsanto because, as Monsanto's insurer, Liberty Mutual had actually paid the amount that Mrs. Case received pursuant to her settlement with Monsanto. However, since there is now no claim that Monsanto is not the real party in interest, the joinder of Liberty Mutual as a possible real party in interest has no bearing on this appeal.

Hearing the case without a jury, the district court found "that Monsanto and Smith were equally guilty of negligence" [6] and held that Smith should bear one-half the cost of Monsanto's settlement and attorney's fees and expenses. The court further held that Travelers was entitled to recover from Monsanto the amount of compensation benefits it had paid. Smith appeals the judgment against it in favor of Monsanto, and Monsanto cross appeals. Monsanto also appeals the judgment against it in favor of Travelers. We reverse in part and remand.

## I.

Monsanto asserts that it is entitled to indemnity from Smith, and in support of this claim Monsanto invokes two theories. The first is that Smith in carrying out its duties at the well breached its implied warranty to perform in a workmanlike manner, giving rise to indemnity under the *Ryan* doctrine. The second is that on the facts of this case Smith was actively negligent while Monsanto was only passively negligent, and thus Smith must indemnify Monsanto because of Smith's more serious tortious conduct.

### A.

We consider first the *Ryan* issue. In Ryan Stevedoring Company v. Pan-Atlantic Steamship Corporation, 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, the stevedoring company (Ryan) by informal agreement had contracted with the steamship company (Pan-Atlantic) to perform all its coastal stevedoring operations. While unloading cargo on one of Pan-Atlantic's ships, a Ryan employee was injured when he was struck by a heavy roll of pulpboard which had been improperly stowed. The employee

---

6. 277 F.Supp. at 292. See *id.* at 290–291:

"There is no question of Smith's negligence. Francis and Walker conceded that they gave the crew no specific safety instructions as each man was supposed to be an experienced oil field worker and capable of taking care of himself; conceded that no safety line had been provided as an escape route other than the guy lines from the outside of the derrick to the ground; nor was Case instructed to come down if oil began flowing. In the event of a flow, the purpose of the stabbing valves was to control the flow. The Court finds that the failure of the crew to install the stabbing valve in the interval following the first flow, and thereby allowing the well to become out of control may well have been one cause of the fire.

"Monsanto's negligence was not so patent, but there were several areas in which a jury could have found Monsanto liable * * *. [Barfield] was a petroleum engineer with experience in the oil field and was in charge of outlining to Smith and its supervisory employees the over-all procedure in the work-over job. * * * [It appears that there was not] enough salt water [in the well] to prevent the well's heading. * * * As the amount of water necessary was Barfield's calculation based on his engineering knowledge, the Court finds that he had a cor-responding duty to see that enough was in the well before the crew pulled the tube.

"* * * Monsanto [furnished] the working area for this crew, including the location of the eyes imbedded in the concrete floor to which the crew attached their rig. It was conceded that the rig, including the draw-works motor, would have been as operable if placed further from the well-head than it was, thereby reducing the hazard of oil splashing on or around the motor. Neither McGraw nor Barfield felt it necessary to suggest such a move, yet Barfield did insist on a cessation in the tube pulling until blow-out preventers were installed and stabbing valves were present on the floor of the well. Barfield denied that he was aware of the spillage between the 35th and 36th joints or the cutting off of the motor and work stoppage, yet he was there in his car at a crucial time in the operation where he could and said he would have directed some procedure other than losing control of the well had he known it.

"The Court finds that the omissions of responsibility assumed by Monsanto, in not seeing that the procedures outlined by its supervisory employees were carried out, were negligence and could have been the proximate cause of the unexpected flow of oil resulting in the flash fire and fatal injuries to Case."

brought suit against the shipowner and recovered because the ship was found to be unseaworthy. The shipowner in turn sued the stevedore, seeking reimbursement for the damage paid to the injured employee. The Supreme Court held that the shipowner's action for indemnity could be maintained. In reaching this result, the Court held that the action was not barred by the exclusive-liability provision of section 5 of the Longshoremen's and Harbor Workers' Compensation Act:[7]

> "While the Compensation Act protects a stevedoring contractor from actions brought against it by its employee on account of the contractor's tortious conduct causing injury to the employee, the contractor has no logical ground for relief from the full consequences of its independent contractual obligation, voluntarily assumed to the shipowner, to load the cargo properly." 350 U.S. at 131, 76 S.Ct. at 236, 100 L.Ed. at 140.

Moreover, in the absence of an express indemnification agreement, the Court held that a stevedore's contract with a shipowner includes an implied warranty of workmanlike performance:

> "The shipowner here holds petitioner's uncontroverted agreement to perform all of the shipowner's stevedoring operations at the time and place where the cargo in question was loaded. That agreement necessarily includes petitioner's obligation not only to stow the pulp rolls, but to stow them properly and safely. Competency and safety of stowage are inescapable elements of the service undertaken. This obligation is not a quasi-contractual obligation implied in law or arising out of a noncontractual relationship. It is of the essence of petitioner's stevedoring contract. It is petitioner's warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product." 350 U.S. at 133–134, 76 S.Ct. at 237, 100 L.Ed. at 141–142.

In construing *Ryan*, we note at the outset that the shipowner's remedy is grounded conceptually in the *contract* with the stevedore and not in the negligence of the stevedore.[8] See Italia Societa v. Oregon Stevedoring Company, 1964, 376 U.S. 315, 84 S.Ct. 748, 11 L. Ed.2d 732; Waterman Steamship Corporation v. Dugan & McNamara, Inc., 1960, 364 U.S. 421, 81 S.Ct. 200, 5 L. Ed.2d 169; Crumady v. Joachim Hendrik Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413; Weyerhaeuser Steamship Company v. Nacirema Operating Company, 1958, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491. This court has repeatedly recognized the contract rationale underlying *Ryan* and its progeny. Grigsby v. Coastal Marine Service of Texas, Inc., 5 Cir. 1969, 412 F.2d 1011, 1040; Loffland Brothers Company

7. Section 5 of the Act, 33 U.S.C.A. § 905, provides as follows:
> The liability of an employer [for compensation under the Act] shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death, except that if an employer fails to secure payment of compensation as required by this chapter, an injured employee, or his legal representative in case death results from the injury, may elect to claim compensation under this chapter, or to maintain an action at law or in admiralty for damages on account of such injury or death. In such action the defendant may not plead as a defense that the injury was caused by the negligence of a fellow servant, nor that the employee assumed the risk of his employment, nor that the injury was due to the contributory negligence of the employee.

8. In addition to the cases cited herein, see Carrere, Recent Developments in Personal Injury Law in the Tidelands, 32 Tulane L.Rev. 275, 287–88 (1958); Note, The Ryan Doctrine: Present Stature and Future Development, 37 Tulane L.Rev. 786 (1963); Note, 62 Mich.L. Rev. 1446 (1964); Note, 66 Yale L.J. 581, 584 (1957); Note, 36 Boston U.L. Rev. 312, 314 (1956).

v. Roberts, 5 Cir. 1967, 386 F.2d 540, 548–549, cert. denied, 389 U.S. 1040, 88 S.Ct. 778, 19 L.Ed.2d 830; Centraal Stikstof Verkoopkanter, N. V. v. Walsh Stevedoring Company, 5 Cir. 1967, 380 F.2d 523, 529; Ocean Drilling & Exploration Company v. Berry Brothers Oilfield Service, Inc., 5 Cir. 1967, 377 F. 2d 511, 512–513, cert. denied, 389 U.S. 849, 88 S.Ct. 102, 19 L.Ed.2d 118; Lusich v. Bloomfield Steamship Company, 5 Cir. 1966, 355 F.2d 770, 775–776; see Tri-State Oil Tool Industries, Inc. v. Delta Marine Drilling Company, 5 Cir. 1969, 410 F.2d 178, 184; Halliburton Company v. Norton Drilling Company, 5 Cir. 1962, 302 F.2d 431, 434–435, cert. denied, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052.

Moreover, we deem it of fundamental importance to recall that *Ryan* was conceived as an admiralty concept to meet special problems which had arisen in the law of admiralty.[9] Mindful of its origins in the realm of admiralty law, this court has consistently refused to extend its

9. The view taken by this court and by other courts that the Supreme Court in *Ryan* was announcing an admiralty doctrine applicable to shipowners rather than a general rule is buttressed, we think, not only by the facts in *Ryan*, by the Court's opinion in *Ryan*, and by decisions subsequent to *Ryan*, but also by scholarly appraisals of the *Ryan* decision. Law review writers have characterized the indemnity theory announced in *Ryan* as a concept designed to meet special admiralty law problems involving shipowners and stevedores. In the words of one commentator, *Ryan* must be viewed in the light of "the never-ending dispute between shipowners and their contracting stevedores as to which party ultimately is to respond in damages, assuming that the longshoreman's cause of action for personal injuries against the vessel owner is a meritorious one." Bue, Admiralty Law in the Fifth Circuit—A Compendium for Practitioners: I, 4 Houston L. Rev. 347, 408 (1966). In the wake of Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (extending the shipowner's warranty of seaworthiness to longshoremen employed by an independent contracting stevedore), shipowners found themselves in "a most unenviable position." Bue, *supra*, at 409. " * * * They were cast in liability under the expanding theory of unseaworthiness in instances frequently involving circumstances which pointed to the conclusion that shipowner and stevedore were joint tort-feasors; yet the shipowner was denied any recourse against the stevedore because of the hallowed common-law doctrine engrafted onto the maritime law that there would be no contribution between joint tort-feasors except in both-to-blame situations in collision cases. In the case of Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp. [1952, 342 U.S. 282, 76 S.Ct. 277, 96 L.Ed. 318] a jury had apportioned twenty-five per cent of the responsibility for the longshoreman's injuries to the shipowner and seventy-five per cent to the stevedore, but the Supreme Court denied any relief to the shipowner by enunciating the ancient no-contribution principle. The Court's position was reaffirmed shortly thereafter, insofar as maritime personal injury suits were concerned, in Pope & Talbot v. Hawn [1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143], and there the matter stood until the advent of *Ryan*.

\* \* \* \* \*

"As courts are occasionally wont to do, the Supreme Court saw fit to devise a way to circumvent the legal roadblock of the rule against contribution between joint tort-feasors, and *Ryan* was the case in which they did it. * * *

"Viewed in the light of its prior decisions in *Halcyon* and *Hawn*, the Court's departure from tort law to embrace contractual concepts in order to permit indemnity was strongly motivated by a recognition of the highly inequitable position which shipowners occupied following *Sieracki*."

Bue, *supra*, at 409–10 (footnotes omitted). See Stover, Longshoreman-Shipowner-Stevedore: The Circle of Liability, 61 Mich.L.Rev. 539, 548–50 (1963); White, A New Look at the Shipowner's Right-Over for Shipboard Injuries, 12 Stan.L.Rev. 717, 718–20 (1960); Comment, 6 N.Y.L.F. 168, 176–80 (1960); Note, 44 Calif.L.Rev. 800, 802–03 (1956); Note, 32 Geo.Wash.L. Rev. 893, 894 (1964); Note, 66 Yale L.J. 581 (1957). *But cf.* cases cited by Judge Wisdom in General Electric Co. v. Cuban American Nickel Co., 5 Cir. 1968, 396 F.2d 89, 92–93; cases cited by Judge Rives in Halliburton Co. v. Norton Drilling Co., 5 Cir. 1962, 302 F.2d 431, 439, cert. denied, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052 (dissenting opinion).

application to non-maritime situations. We have held on numerous occasions that *Ryan* stops at the water's edge.

For example, in General Electric Company v. Cuban American Nickel Company, 5 Cir. 1968, 396 F.2d 89, 92, Judge Wisdom wrote:

> "The complexities and nuances involved in application of the *Ryan* doctrine in admiralty do not now concern us: The instant case turns on Louisiana law, not on federal admiralty law. We consider the *Ryan* doctrine inapplicable to the present case."

In the same vein, *Ryan* was declared to be waterborne and not landbased in the words of Judge Tuttle in General Dynamics Corporation v. Adams, 5 Cir. 1965, 340 F.2d 271, 279:

> "We are here concerned with the Florida rule with respect to the right of indemnity for, while the right to proceed in a third party action is established by Federal rule, such right depends upon the existence of a state created liability. Thus, the Supreme Court decisions in Maritime cases, * * * recognizing the right of a shipowner to recover against a stevedoring company when successfully sued by an employee of the stevedoring concern, are not in point here." (Case citations omitted.)

Compelling policy reasons for confining *Ryan* to the admiralty domain where it achieved its nascence were convincingly articulated by Judge Gewin in Centraal Stikstof Verkoopkanter, N.V. v. Walsh Stevedoring Company, 5 Cir. 1967, 380 F.2d 523, 529:

> "The *Ryan* doctrine establishes a severe and harsh rule which imposes a substantial and heavy burden on the stevedore or one similarly situated. * * * Because of the weight of this burden, and because of the far reaching implications of the doctrine if applied outside its original context, we have been slow to expand the scope of the doctrine beyond the original factual circumstances in which it arose. * * * The implied warran-ty established in *Ryan* is a product of the admiralty courts and a creature of admiralty law. It is tied closely to the duties and obligations which the admiralty law imposes on shipowners with respect to those employed by and who work on a ship. * * * Those cases in which the doctrine has been applied have been admiralty cases which presented substantially similar circumstances to those existing in *Ryan*. * * * We are accordingly hesitant to apply the doctrine to this, a non-maritime case, which is controlled by Alabama and not federal maritime law. * * * " (Case citations omitted.)

Aware of these reasons, this court in other recent cases has reiterated the conviction that *Ryan* should not be extended beyond the scope of the admiralty situations in which it arose. See, e. g., Grigsby v. Coastal Marine Service of Texas, Inc., 5 Cir. 1969, 412 F.2d 1011, 1041 (Brown, C. J.) (" * * * the *Ryan* theory is conceptually unrelated to local tort principles * * *."); United States v. Seckinger, 5 Cir. 1969, 408 F.2d 146, 153, cert. granted, 396 U.S. 815, 90 S.Ct. 104, 24 L.Ed.2d 67 (Brown, C. J.) ("So far this Court has kept this newly formed concept strictly confined to salt water or at least amphibious applications."); Loffland Brothers Company v. Roberts, 5 Cir. 1967, 386 F.2d 540, 549, cert. denied, 389 U.S. 1040, 88 S.Ct. 778, 19 L.Ed.2d 830 (Gewin, J.) ("Recognizing this unique obligation on the part of a shipowner, we have held that the *Ryan* doctrine is closely tied to a vessel and this obligation which the shipowner owes to those employed on the vessel. * * * We are accordingly extremely hesitant to extend the burdensome *Ryan* doctrine to situations not substantially similar to those which gave birth to the doctrine."); Ocean Drilling & Exploration Company v. Berry Brothers Oilfield Service, Inc., 5 Cir. 1967, 377 F.2d 511, 513, cert. denied, 389 U.S. 849, 88 S.Ct. 102, 19 L.Ed.2d 118 (Thornberry, J.) ("While freely implementing this contractual obligation of

the stevedore to indemnify the shipowner in accordance with the liberal spirit of *Ryan,* we have hesitated, however, to extend it beyond those controversies involving the 'special rules governing the obligations and liability of shipowners' which necessitated its formulation and justify its application.").

In short, *Ryan* was conceived as an admiralty concept, and its explicatory progeny have not denied its paternal thesis. We find nothing in the wake of *Ryan* to lead us to apply its principles to landlubbers. It is abundantly clear that no tributary of *Ryan* reaches the Brookhaven Oil Field in Lincoln County, Mississippi, which is many miles inland from both the Mississippi River and the Gulf of Mexico.

■ Consequently, in deciding this issue we cannot distill Mississippi law through a federal sieve; we must completely abandon the admiralty domain and repair to Mississippi's inland terrain. Looking solely to Mississippi's independent jurisprudence, we are unable to find any authority clearly indicating that Mississippi recognizes a *Ryan*-type implied contract of indemnity in a situation such as the case before us.[10] Accordingly, we must conclude that Monsanto is not entitled to indemnity on the basis of its contract theory. The trial court's conclusion to the contrary was erroneous.

### B.

■ Monsanto's second theory in support of its claim of indemnity is a tort theory. Monsanto contends that Smith is liable to Monsanto under the common law theory of indemnity because Smith's negligence was "active" while Monsanto's negligence was only "passive." As we view the facts, however, this contention has no merit. Monsanto and Smith were in pari delicto; each was guilty of acts or omissions which could have proximately caused the death of Paul Case. We have examined the record and find adequate support for the trial court's conclusion "that Monsanto and Smith were equally guilty of negligence." [11]

Even if this were not the case, Smith would be shielded from liability to Monsanto on a tort theory by the exclusive-remedy provisions of the Mississippi Workmen's Compensation Act. The statute's remedial exclusivity is set forth in section 5 of the Act, Mississippi Code § 6998-05:

The liability of an employer to pay compensation shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next-of-kin, and anyone otherwise entitled to recover damages at common law or from such employer on account of such injury or death, except that if an employer fails to secure payment of compensation as required by this act, an injured employee, or his legal representative in case death results from the injury, may elect to claim compensation under this act, or to maintain an action at law

10. Monsanto cites a number of cases in support of its contention that this type of indemnity does exist under Mississippi law. The cases cited by Monsanto fall into three categories: (1) maritime cases, i. e., *Ryan* and its progeny, (2) non-maritime cases from jurisdictions other than Mississippi, and (3) Mississippi cases. The maritime cases are not applicable for the reasons given in the text of this opinion. Moreover, the non-maritime cases from other jurisdictions clearly cannot indicate what the law is in Mississippi. Only two Mississippi cases are cited. Bowyer & Johnson Construction Co. v. White, 5 Cir. 1958, 255 F.2d 482 (applying Mississippi law); Nasif v. Booth, 1954, 221 Miss. 126, 72 So.2d 440. These cases are simply inapposite. They cannot fairly be read to support the proposition that where two tortfeasors are guilty of concurrent acts of negligence, Mississippi law requires one to indemnify the other.

It should be noted that Bowyer & Johnson Construction Co. v. White, *supra*, was the only non-maritime case cited in the opinion of the district court. See 277 F.Supp. at 291–292.

11. 277 F.Supp. at 292. See footnote 6, *supra.*

for damages on account of such injury or death. In such action the defendant may not plead as a defense that the injury was caused by the negligence of a fellow servant, nor that the employee assumed the risk of his employment, nor that the injury was due to the contributory negligence of the employee.

■ In considering this provision of the Act, we acknowledge that no Mississippi court has passed on the precise question before us. In this jurisprudential void, after we have engaged in futile searching to find the law, *Erie* requires us to surrogate for Mississippi until it speaks authoritatively. In fulfilling the *Erie* mandate, we hold that, because of the provisions of Mississippi Code § 6998–05, a third party which has been held liable to an employee may not receive indemnity from the employer on a tort theory.

We are aided in reaching this conclusion by similar holdings concerning workmen's compensation statutes in other jurisdictions. See, e. g., General Electric Company v. Cuban American Nickel Company, 5 Cir. 1968, 396 F.2d 89 (Louisiana law); O'Steen v. Lockheed Aircraft Corporation, N.D.Ga.1968, 294 F. Supp. 409, *followed* in Central of Georgia Railway Company v. Lester, 1968, 118 Ga.App. 794, 165 S.E.2d 587; *cf.* General Dynamics Corporation v. Adams, 5 Cir. 1965, 340 F.2d 271, 278 (Florida law). These decisions are grounded in the concept that the workmen's compensation scheme has "completely abolished an employer's *tort* liability for injuries to his employees." Halliburton Company v. Norton Drilling Company, 5 Cir. 1962, 302 F.2d 431, 434, cert. denied, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052. A workmen's compensation scheme is,

in effect, a state-enforced "bargain" between employee and employer, in which each party gains something: "The injured employee is provided with a *certain* recovery, [and] the employer is * * * shielded from any tort action arising from the injury." General Electric Company v. Cuban American Nickel Company, *supra*, 396 F.2d at 100.

■ The Mississippi Legislature has clearly denied to an employee the right to bring an action in tort directly against his employer. Mississippi Code § 6998–05. See L. B. Priester & Son, Inc. v. Dependents of Bynum, 1962, 244 Miss. 185, 137 So.2d 907, 141 So.2d 246, 142 So.2d 30, 31. Courts construing Mississippi law should not allow an employee to do indirectly (through a third party) what he has been forbidden to do directly. "[H]aving paid compensation for an injury to its employee one time, the [employer] cannot be liable again in tort." O'Steen v. Lockheed Aircraft Corporation, *supra*, 294 F.Supp. at 412. Thus, even if Monsanto were correct in asserting that its negligence was "passive" while Smith's was "active," the exclusive-liability provision of the Workmen's Compensation Act would stand as a Horatio at the bridge to bar Monsanto's claim to indemnity from Smith.

### C.

In our consideration of the indemnity issue, one confusing aspect of the trial court's opinion is deserving of comment. The court concluded "that Smith should bear one-half the cost of Monsanto's settlement and attorney fees and expenses." 277 F.Supp. at 292. This apportionment of damages might seem to indicate that the trial court was awarding contribution rather than indemnity.[12]

---

12. There is, of course, a significant distinction between the measure of damages applicable to contribution and the measure of damages applicable to indemnity. Contribution involves the distribution of the loss proportionately among the tortfeasors. Indemnity, on the other hand, involves the shifting of the entire loss from one party to another.

See Ingham v. Eastern Air Lines, Inc., 2 Cir. 1967, 373 F.2d 227, 240 n. 12, cert. denied, 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292; Prosser, The Law of Torts § 48, at 278–79 (3d ed. 1964); 41 Am.Jur.2d, Indemnity § 3 (1968); 18 C.J.S., Contribution § 1 (1939).

However, the remainder of the trial court's opinion deals with the concept of indemnity; all the cases cited in the trial court's opinion are indemnity cases; and the parties involved in this appeal have briefed and argued the case in terms of indemnity rather than contribution. Consequently, despite the trial court's rather confusing award of damages, we are firm in our conviction that the concept of contribution is not involved in this case, and we do not reach any issue related to that concept. Viewing this case as one involving the concept of indemnity, we hold that Monsanto is entitled to recover nothing from Smith.

## II.

In a separate appeal Monsanto contests the judgment rendered against it in favor of Travelers, Smith's workmen's compensation carrier. The trial court allowed Travelers to intervene and awarded Travelers a judgment in the amount of $3,117.05, the amount Travelers had paid in compensation benefits. Monsanto contends that the trial court erred in several respects concerning Travelers' intervention. First, Monsanto asserts that the district court erred in assuming jurisdiction over Travelers' claim. Second, Monsanto argues that Travelers' petition to intervene should have been dismissed on the ground that it was not timely filed. Finally, Monsanto contends that the district court erred

in failing to dismiss Travelers' suit at the conclusion of the evidence offered by Travelers. For the reasons hereinafter given, we find no merit in any of these contentions.

### A.

Monsanto's first assertion of error is that the trial court lacked jurisdiction to entertain the claim of Travelers. Characterizing Travelers' intervention as permissive intervention under Rule 24(b),[13] Monsanto relies on the rule that such permissive intervention requires an independent jurisdictional basis, i. e., that the jurisdictional requirements of 28 U.S.C.A. § 1332 must be pleaded and proved. These requirements are, of course, (1) an amount in controversy in excess of $10,000.00, and (2) diversity of citizenship. Here these requirements were not met because (1) the amount in controversy was clearly less than $10,000.00, and (2) there was no showing of the existence of diversity.

Travelers contends, however, that what is involved here is not permissive intervention under Rule 24(b), but rather intervention as a matter of right under Rule 24(a).[14] If Travelers is correct in its characterization of its intervention, no jurisdictional problem exists, because no independent ground of jurisdiction need be shown to support intervention as a matter of right. Lenz v.

13. Fed.R.Civ.P. 24(b):
   Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall

consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

14. Fed.R.Civ.P. 24(a):
   Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Wagner, 5 Cir. 1957, 240 F.2d 666, 669; 3B Moore, Federal Practice ¶ 24.18 (2d ed. 1969); 2 Barron & Holtzoff, Federal Practice and Procedure § 593 (Wright ed. 1961). On the facts of this case, we agree with Travelers that this intervention comes within the purview of Rule 24(a).

Rule 24(a) allows a party to intervene as a matter of right

"when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the

disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

It is clear that Travelers possessed a right of subrogation under Mississippi law by virtue of section 30 of the Mississippi Workmen's Compensation Act, Mississippi Code § 6998–36.[15] See Merchants Company v. Hutchinson, Miss. 1967, 199 So.2d 813; Richardson v. United States Fidelity & Guaranty Company, 1958, 233 Miss. 375, 102 So.2d 368. It

---

15. Miss.Code § 6998–36 provides as follows:

Compensation for injuries where third parties are liable.—The acceptance of compensation benefits from or the making of a claim for compensation against an employer or insurer for the injury or death of an employee shall not affect the right of the employee or his dependents to sue any other party at law for such injury or death, but the employer or his insurer shall be entitled to reasonable notice and opportunity to join in any such action or may intervene therein. If such employer or insurer join in such action they shall be entitled to repayment of the amount paid by them as compensation and medical expenses from the net proceeds of such action (after deducting the reasonable costs of collection) as hereinafter provided.

The commencement of an action by an employee or his dependents (or legal representative) against a third party for damages by reason of the injury, or the adjustment of any such claim, shall not affect the right of the injured employee or his dependents (or legal representative) to recover compensation, but any amount recovered by the injured employee or his dependents (or legal representative) from a third party shall be applied as follows: Reasonable costs of collection as approved and allowed by the court in which such action is pending, or by the commission of this state in case of settlement without suit, shall be deducted; the remainder, or so much thereof as is necessary, shall be used to discharge the legal liability of the employer or insurer, and any excess shall belong to the injured employee or his dependents. The employee or his dependents bringing suit against the third party must notify the employer or carrier within fifteen days of the filing of such suit.

An employer or compensation insurer who shall have paid compensation benefits under this act for the injury or death of the employee shall have the right to maintain an action at law against any other party responsible for such injury or death, and in the name of such injured employee or his beneficiaries, or in the name of such employer or insurer, or any or all of them. If reasonable notice and opportunity to be represented in such action by counsel shall have been given to the compensation beneficiary, all claims of such compensation beneficiary shall be determined in such action, as well as the claim of the employer or insurer. If recovery shall be had against such other party, by suit or otherwise, the compensation beneficiary shall be entitled to any amount recovered over and above the amount that the employer and insurer shall have paid or are liable for in compensation or other benefits, after deducting the reasonable costs of collection.

In case of settlement of any action before the trial thereof, such settlement shall be subject to the approval of the court wherein such action is pending, and settlement before an action is brought shall be subject to the approval of the commission. Distribution of the portion belonging to the dependents shall be made among such dependents in the manner provided for in this act.

In case of liability of the employer or insurer to make payment to the state treasury under the second injury fund provisions, if the injury or death creates a legal liability against a third party, the employer or insurer shall have a right of action against such third party for reimbursement of any sum so paid into the state treasury, which right may be enforced in the action heretofore provided for or by an independent action.

has been held that where the state workmen's compensation law permits subrogation of a compensation carrier, the carrier is entitled to intervene as a matter of right. Black v. Texas Employers Insurance Association, 10 Cir. 1964, 326 F.2d 603; see Kelley v. Summers, 10 Cir. 1954, 210 F.2d 665, 672–674.

■ Since Travelers was intervening as a matter of right under Rule 24(a), there was no requirement that Travelers plead and prove an independent basis of jurisdiction. The trial court clearly had jurisdiction over Travelers' claim.

### B.

Even if the trial court had jurisdiction, Monsanto contends that Travelers' application to intervene should have been rejected because it was not "timely." This contention is based primarily on the fact that more than a year and a half elapsed between the filing of the original action on November 25, 1963, and the filing of Travelers' petition to intervene on June 28, 1965.

■ It is true, of course, that an application for intervention, whether as a matter of right or permissive, must in every case be timely; Rules 24(a) and 24(b) provide for intervention "upon timely application." See 2 Barron & Holtzoff, Federal Practice and Procedure § 594, at 364 (Wright ed. 1961); 3B Moore, Federal Practice ¶ 24.13, at p. 24–521 (2d ed. 1969). The determination as to whether an application to intervene is timely, however, is a matter within the sound discretion of the trial court. Lumbermens Mutual Casualty Company v. Rhodes, 10 Cir. 1968, 403 F.2d 2, 5, cert. denied, 394 U.S. 965, 89 S.Ct. 1319, 22 L.Ed.2d 567; Tesseyman v. Fisher, 9 Cir. 1955, 231 F.2d 583, 584; Washington Gas Light Company v. Baker, 90 U.S.App.D.C. 98, 195 F.2d 29, 32; Simms v. Andrews, 10 Cir. 1941, 118 F.2d 803, 805–806; Medd v. Westcott, E.D.Iowa 1963, 32 F.R.D. 25, 28; Union National Bank v. Superior Steel Corporation, W.D.Pa.1949, 9 F.R.D. 124, 127; 2 Barron & Holtzoff, supra, § 594, at 364–365; 3B Moore, supra, ¶ 24.13, at p. 24–524.

■ Moreover, "[w]hether an application for intervention is timely does not depend solely upon the amount of time that may have elapsed since the institution of the action, although of course that is a relevant consideration." 3B Moore, supra, ¶ 24.13, at p. 24–523; accord, Wooten v. Moore, E.D.N.C.1967, 42 F.R.D. 236, 240, aff'd, 4 Cir. 1968, 400 F.2d 239, cert. denied, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776; Basle Theatres, Inc. v. Warner Bros. Pictures Distributing Corporation, W.D. Pa.1959, 24 F.R.D. 476, 477; 2 Barron & Holtzoff, supra, § 594, at 365–366. The trial court may take into account all the circumstances of the case, including any circumstances contributing to delay in the application for intervention. SEC v. Bloomberg, 1 Cir. 1962, 299 F.2d 315, 320; Kozak v. Wells, 8 Cir. 1960, 278 F.2d 104, 109, 84 A.L.R.2d 1400; Clark v. Sandusky, 7 Cir. 1953, 205 F.2d 915, 918; Pellegrino v. Nesbit, 9 Cir. 1953, 203 F.2d 463, 465, 37 A.L.R.2d 1296; Kaplan v. Guardian Life Insurance Company of America, W.D.Mo.1964, 231 F. Supp. 874, 876–877; 2 Barron & Holtzoff, supra, § 594, at 365–366; 3B Moore, supra, ¶ 24.13. Furthermore, it has been suggested that "the most important factor" which should be considered by the trial court "is whether any delay in moving for intervention will prejudice the existing parties to the case." 2 Barron & Holtzoff, supra, § 594, at 366.

Applying these principles, courts have allowed intervention months or even years after the original filing of the suit "where the substantial litigation of the issues had not been commenced when the motion to intervene was filed." 3B Moore, supra, ¶ 24.13, at p. 24–523. See Kozak v. Wells, supra; Clark v. Sandusky, supra; Plitt v. Stonebraker, 90 U.S. App.D.C. 256, 195 F.2d 39, 42; Pyle-National Company v. Amos, 7 Cir. 1949, 172 F.2d 425, 428; Pure Oil Company v. Ross, 7 Cir. 1948, 170 F.2d 651, 653; Tennessee Coal, Iron & R. Co. v. Muscoda Local 123, N.D.Ala.1946, 5 F.R.D. 174,

177; Innis, Speiden & Company v. Food Machinery Corporation, D.Del.1942, 2 F.R.D. 261, 265.

■ Although the petition to intervene in the present case was filed more than nineteen months after the filing of the original action, it was nevertheless filed long before the trial of this case and before Monsanto settled with Mrs. Case. Moreover, we consider it relevant to note that Travelers gave a reason for its delay: in its petition to intervene Travelers stated that it had delayed its intervention at the request of Mrs. Case's attorneys who felt that intervention by Travelers might adversely affect her cause of action. In addition, we are unable to perceive any way in which any party could have been prejudiced by the timing of Travelers' intervention. Accordingly, we find that the district court did not abuse its discretion in granting Travelers' motion to intervene.

### C.

Monsanto also contends that the district court erred in overruling Monsanto's motion to dismiss at the conclusion of Travelers' evidence. At that point in the case, Monsanto tells us, there was no showing of any fault or responsibility on the part of Monsanto for the death of Paul Case. Consequently, Monsanto maintains, the trial court was compelled by Rule 41(b) [16] to dismiss Travelers' claim.

■ Even if we were to assume that Monsanto is correct in its assessment of the evidence at that point in the trial, Monsanto's view of the law is incorrect. The trial court was not required to rule on the motion to dismiss at that time. Under Rule 41(b), when the defendant moves for a dismissal at the completion of the plaintiff's presentation of evidence, the trial court has two options: (1) The court "as trier of the facts may then determine them and render judgment against the plaintiff," or (2) the court "may decline to render any judgment until the close of all the evidence." In this case the trial court properly exercised the second option, reserving a ruling on the motion to dismiss. The court's action was clearly in compliance with Rule 41(b).

### D.

An additional problem remains for disposition. In awarding judgment for Travelers, the court below ordered that Travelers be reimbursed by Monsanto. Although we agree with the trial court that Travelers is entitled to reimbursement for the amount of compensation payments which it paid to the dependents of Paul Case, Monsanto is not the proper source of reimbursement. Instead, in accordance with the provisions of Mississippi Code § 6998–36,[17] Travelers should be reimbursed from the settlement which Monsanto paid to Mrs. Case. The judg-

---

16. Fed.R.Civ.P. 41(b):

Involuntary Dismissal: Effect Thereof. For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against him. After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52 (a). Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits.

17. See footnote 15, *supra.*

ment below should be modified accordingly.

### III.

In its quest for indemnity, Monsanto must suffer disappointment. Neither its invocation of the *Ryan* doctrine nor its incantation of the magic words "active-passive" can subject Smith to indemnity. Monsanto must leave this court with empty hands.

More successful is the quest of Travelers for reimbursement. Travelers is entitled to recover, but the source of its recovery must be the settlement paid by Monsanto to Mrs. Case and her children.

The judgment is reversed in part and the cause is remanded to the district court for further proceedings consistent with this opinion.